**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PEDRO REYNOSO,** | : | **CIVIL ACTION** |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CYNTHIA LINK,** *et al.* | : | **NO.  16-1721** |
| | : | |
| **Respondents.** | | |

### SUPPLEMENTAL RESPONSE

Petitioner, Pedro Reynoso, is a Pennsylvania state prisoner serving a life sentence for two counts of first-degree murder and related charges for the killing of Carlos Torres and Carlos Cartagena. Respondents were ordered to file a supplemental response memorandum addressing Reynoso's Post-Remand Brief (ECF No. 40) and his Supplemental Amended 2254 Petition (ECF No. 71). ECF No. 73.

Petitioner concedes that his habeas petition and its subsequent supplements are untimely because his conviction became final on July 28, 1999. Nonetheless, he contends that new evidence proves that he is actually innocent of the murders and this excuses the time bar. Reynoso argues that two types of evidence prove his innocence: (1) evidence implicating

"Chuito"[1] in the murders, and (2) evidence placing Reynoso in the Dominican Republic ("DR"). However, as explained in the Discussion section below, the evidence Reynoso has presented does not demonstrate that it is more likely than not that no reasonable juror would have convicted Reynoso in light of the new evidence, and therefore Petitioner has not established his innocence.[2]

First, the evidence implicating "Chuito" as the shooter comes from the recanting eyewitnesses that this Court has already found to be unreliable. Additional new evidence presented in the supplemental petition suggests that Chuito had a motive to kill the victims, but at trial there was testimony that Reynoso worked for Chuito's drug operation, the murders were retaliation for slights against Chuito, and that Chuito was in the backseat of the car that Reynoso shot from. Therefore, additional evidence that Chuito had a motive to kill the victims, or was otherwise involved in the murders, does not establish that Reynoso is innocent but only underscores why Reynoso,

---

[1] Only the nickname "Chuito" was used to refer to this person at trial, and Reynoso refers to him as Chuito in his post-remand brief and supplemental petition, and therefore that name will be used in this response.

[2] Because Reynoso has not established that he is actually innocent, his petition should be dismissed based on its untimeliness. Therefore, in the interests of judicial economy, Respondents will not address his underlying claims of constitutional error. Should the Court wish to hear from Respondents regarding Reynoso's claims of error, Respondents respectfully request the opportunity to supplement this response.

who worked for Chuito's drug operation, would also have had a motive for murder.

Second, Reynoso has not established that he was in the DR on the date of the shootings. Reynoso claims that the evidence shows that he was in the DR on July 13, 1991 and also on July 27, 1991, and therefore because there are no stamps in his passport showing his travel to the United States between that period, he could not have been in the United States on July 23, 1991, the date of the murder. However, the additional alibi witnesses that Reynoso presents are largely cumulative of the alibi witnesses (including a priest) that he presented at trial. And some of the new evidence that Reynoso presents shows that he was, or at least could have been, in the United States at the time of the murder. Recanting eyewitness Sarah Robinson said in her September 2021 statement that while she no longer claims that Reynoso was the shooter, she did see him in Philadelphia on July 23, 1991, the day of the shooting. Additionally, proposed alibi witness Dr. Ana Luisa Milagros Rosario stated in her August 2020 interview that when Reynoso was in the DR, he would usually accompany his wife to prenatal appointments, but that he primarily lived in the United States and went back and forth between the two countries, notwithstanding the fact that there are no stamps in his passport showing this. This establishes that Reynoso did

move between the DR and the United States without his passport showing that travel.

Additionally, after over thirty years, Reynoso now admits that some of the stamps in his passport, which he previously claimed established his alibi in the DR, were forged. He now claims he did not obtain the forged stamps to create an alibi but instead to commit immigration fraud. His belated explanation for the forged stamps is not new evidence, let alone reliable evidence of innocence, and, in fact, it undermines the believability of his alibi.

Thus, Reynoso's petition should be dismissed with prejudice.

## FACTS AND PROCEDURAL HISTORY

The facts of this case and its history in state court were discussed at length in Respondents' response to Reynoso's petition for writ of habeas corpus (ECF No. 21 at 3–20) and in this Court's report and recommendation (ECF No. 23 at 1–8) and will not be reproduced in full here. ECF No. 21 at 3–20. In short, Reynoso was convicted of the July 23, 1991 drive-by double-murder of Carlos Torres and Carlos Cartagena. The Commonwealth's case rested primarily on three pieces of evidence: (1) the eyewitness testimony of Sarah Robinson who testified that Reynoso, whom she knew as "Papad-ito," committed the murder (N.T. 6/26/96 at 164, 169), (2) the eyewitness

testimony of Samuel Wilkerson who also testified that Reynoso, whom he knew as "Papadito," committed the murder (N.T. 6/25/96 at 91), and (3) the expert testimony of Department of Justice forensic document analyst Elaine Wooten who opined that stamps in Reynoso's passport were forged (N.T. 6/26/96 at 86). Reynoso's passport contained six stamps, including two DR stamps dated July 13, 1991 and July 27, 1991, which seemingly indicated that Reynoso was in the DR during that period, which included July 23, 1991, the date of the murder. Wooten testified that she could not determine the authenticity of the July 13, 1991 stamp, but in her expert opinion, the July 27, 1991 stamp was a forgery. N.T. 6/26/96 at 110. Wooten's testimony that Reynoso's passport contained forged stamps purporting to establish an alibi was presented as evidence of Reynoso's consciousness of guilt.

At trial, Reynoso presented alibi testimony from two witnesses: Martha Alamonte, a long-time family friend, and Father Ramon Alejo De La Cruz, a priest. Alamonte testified that she saw Reynoso in the DR "every day" during the July 13–27, 1991 time period. Fr. De La Cruz testified that he flew on the same flight as Reynoso from Puerto Rico to the DR on July 13, 1991, and he also saw Reynoso in the DR on July 27, 1991 at Reynoso's son's baptism. Fr. De La Cruz additionally saw Reynoso in the DR on some other

dates during the July 13–27, 1991 time period, but he could not recall which ones.

Reynoso filed a direct appeal and three Post-Conviction Relief Act petitions in state court. *See* Respondent's Response, ECF No. 21 at 12–21 (describing the state-court proceedings). All of Reynoso's convictions were affirmed.

Reynoso filed a petition for writ of habeas corpus in federal court on April 8, 2016. ECF No. 1. Since Reynoso's conviction became final on July 28, 1999, he conceded that his petition was untimely, but he asserted that this Court could review the merits of his claims because he satisfied the actual innocence standard set forth in *McQuiggin v. Perkins*, 569 U.S. 383 (2013).

Respondents filed a response arguing that Reynoso had not satisfied the *McQuiggin* innocence gateway standard, so his petition should be dismissed. ECF No. 21.

U.S. Magistrate Judge Lynne A. Sitarski filed a report and recommendation ("R&R"), recommending that Reynoso's petition be dismissed as time-barred (ECF No. 23), which District Court Judge Robert F. Kelly approved and adopted (ECF No. 30). In the R&R, this Court found that much of the

evidence presented by Reynoso in his petition was not "new" evidence of innocence because it was known to Reynoso at the time of trial.

Reynoso appealed to the Third Circuit. During the pendency of the appeal, the Third Circuit decided *Reeves v. Fayette SCI*, 897 F.3d 154 (3d Cir. 2018). Respondents agreed to a joint motion for remand for further consideration in light of that opinion, which held that evidence known to the defense at the time of trial can be considered "new" when it is alleged that trial counsel rendered ineffective assistance by failing to present that very evidence. *Reeves*, 897 F.3d at 164–65.

Following the remand, Reynoso filed a post-remand brief. ECF No. 40. Thereafter, Respondents engaged in voluntary discovery with Reynoso. At the conclusion of discovery, Reynoso filed a Supplemental Amended 2254 Petition. ECF No. 71. In the Supplemental Petition, Reynoso argues that there are two categories of evidence that show that he is innocent of the shootings: (1) evidence implicating "Chuito" in the murders, and (2) evidence placing Reynoso in the DR at the time of the murders.

This Court ordered Respondents to respond to Reynoso's supplemental memoranda. ECF No. 73.

For the reasons that follow, Respondents request that Reynoso's petition be denied as untimely without a hearing.

## DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1995 ("AEDPA"), state prisoners have one year to file a federal habeas petition, which begins to run from "the date on which the judgment became final." 28 U.S.C. § 2244(d)(1)(A). However, an untimely petition is not barred when a petitioner makes a "credible showing of actual innocence," which provides a gateway to federal review of the petitioner's otherwise procedurally barred constitutional claim. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).

To satisfy this standard, first, "a petitioner must present new, reliable evidence" and second, "show by a preponderance of the evidence 'that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Houck v. Stickman*, 625 F.3d 88, 93 (3d Cir. 2010) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).

Evidence is "new" under the first step when it is newly discovered or when it was known to the petitioner at the time of trial but "petitioner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that demonstrates his actual innocence…." *Reeves v. Fayette SCI*, 897 F.3d 154, 164 (3d Cir. 2018).

When determining the reliability of the evidence under the first step, "the court 'may consider how the timing of [the petitioner's] submission and the likely credibility of the [witnesses] bear on the probative reliability of that evidence,' as well as the circumstances surrounding the evidence and any supporting corroboration." *Reeves*, 897 F.3d at 161 (quoting *House v. Bell*, 547 U.S. 518, 537 (2006)). "[U]njustifiable delay on a habeas petitioner's part" in presenting the evidence, is not "an absolute barrier to relief, but [is] a factor in determining whether actual innocence has been reliably shown." *McQuiggin*, 569 U.S. at 387. Examples of reliable evidence include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence...." *Schlup*, 513 U.S. at 324. The newly presented evidence "may indeed call into question the credibility of witnesses presented at trial," and thus the "habeas court may have to make some credibility assessments." *Id.* at 330. State court factual findings, including credibility assessments, "bind" the federal courts unless the petitioner can show by "clear and convincing evidence" that they are inaccurate. *Sistrunk v. Rozum*, 674 F.3d 181, 191 (3d Cir. 2012).

"In evaluating the second step—whether it is more likely than not no reasonable juror would convict the petitioner—the court 'must consider all the evidence, old and new, incriminating and exculpatory, without regard

to whether it would necessarily be admitted under the rules of admissibility that would govern at trial.'" *Reeves*, 897 F.3d at 161 (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)). Evidence that does "not eliminate the possibility that the crime occurred as set forth by the prosecution at trial," "would not carry significant weight with the jury," or that does not undermine petitioner's motive or "remove him from the scene of the murder," does not meet this standard. *Goldblum v. Klem*, 510 F.3d 204, 234 (3d Cir. 2007). "However, new, reliable evidence that 'undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime]" can suffice to show actual innocence." *Reeves*, 897 F.3d at 161 (quoting *Goldblum*, 510 F.3d at 233)); *see also Munchinski v. Wilson*, 694 F.3d 308, 336–37 (3d Cir. 2012) (actual innocence was demonstrated where new evidence both showed that the crime could not have happened in the way the Commonwealth argued at trial and provided an alternative theory that was more appropriate and better fit the facts of the case). While recantation evidence is generally suspect, the habeas court cannot categorically reject all recantation evidence because "multiple recantations may themselves be mutually corroborating evidence, with each one having the potential to bolster the reliability of the others." *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 61 (3d Cir. 2020). In weighing the evidence, "[t]he court's function is not to

make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538. The actual innocence standard "does not require absolutely certainty about the petitioner's guilt or innocence," but the "standard is demanding and permits review only in the 'extraordinary' case." *Id.* at 538 (quoting *Schlup*, 513 U.S. at 327).

In his supplemental petition, Reynoso presents the following evidence for this Court's consideration:

(1) Detective Bentham's Homicide Summary which indicates Chuito and Papadito are the two men responsible for the murder (Appx002),

(2) Felo Garcia's Arrest Report which identified Felo Garcia's alias as "Papidito" (Appx314),

(3) Other documents in the Commonwealth's file that identify Felo Garcia's alias as "Popidito" (Appx315–16),

(4) Eleven additional alibi witnesses trial counsel chose not to present, who claim to have seen Reynoso in the DR sometime during the period of July 13, 1991 through July 27, 1991 (Appx137–148)[3],

---

[3] Six of these alibi witnesses were re-interviewed via zoom in August 2020, and these interviews were recorded. *See* ECF No. 71 at 67–68. Reynoso does not attach a video of these recordings, but he did provide a copy to Respondents upon request.

(5) A letter from Reynoso to trial counsel dated December 9, 1996 in which he asks trial counsel to return to him his airline ticket[4] (Appx156–160),

(6) A July 17, 1991 land contract executed between Reynoso and Miguel Almonte in Pimentel, DR (Appx149–50),

(7) A certificate from the July 27, 1991 baptism of Reynoso's son Juan Alexander in Pimentel, DR (Appx151),

(8) Photographs of Reynoso that he claims were taken at his son's baptism in the DR on July 27, 1991 (Appx152–53),

(9) Paperwork dated July 30, 1991 approving a firearms permit for Reynoso in the DR (Appx154–55),

(10) Reynoso's daughter Nallely Massiel's April 22, 1992 DR birth certificate signed by Reynoso (Appx312),

(11) A letter from Dr. Ana Luisa Milagros Rosario explaining that Reynoso accompanied his wife to some of her pre-natal appointments and attended her April 22, 1992 cesarean section (Appx313),

---

[4] Reynoso claims that American Airlines "ticket stubs from Pedro [Reynoso]'s July 13, 1991 flights: Philadelphia to San Juan; and San Juan to Santo Domingo" are new evidence of innocence (ECF No. at 96), but he has not produced those stubs and instead has only produced a letter dated December 9, 1996 in which he requests that trial counsel return to him "Airline ticket" without reference to the dates of the ticket.

(12)    Sarah Robinson's October 2010 and September 2021 statements in which she recanted her trial testimony that Reynoso was the driver/shooter and stated that, instead, Chuito was the driver/shooter (Appx162–69, 183–85),

(13)    Sam Wilkerson's March 2012 affidavit and August 2013 PCRA hearing testimony in which he recanted his trial testimony that Reynoso was the driver/shooter and stated that, instead, Chuito was the driver/shooter (Appx170–72, 259–88),

(14)    Juan Andino's (a.k.a. Jose Colon) July 2011 affidavit that explained Chuito's disdain for Carlos Torres and Charles Cartagena, the victims in this case (Appx173–75),

(15)    Marisol Colon's July 2011 affidavit, in which she states that she confronted Chuito shortly after the double-murder asking him why he killed her brother, one of the victims, to which Chuito responded: "Don't worry about it. I did you a favor" (Appx178–80),

(16)    Marisol Colon's June 2018 statement to the *Philadelphia Inquirer*, in which she told substantially the same story as in her July 2011 affidavit (Appx249–58),

(17)    Attorney Tom Griffin's affidavit regarding Reynoso's fabricated passport stamps (Appx348–58), and

(18)    "The 'absence of evidence' evidence,"

ECF No. 71 at 95–98.

Even if all of this evidence were deemed new[5] and reliable[6] evidence, Reynoso has not established that it is more likely than not that no reasonable juror would have convicted him in light of this new evidence.

As explained below, none of Reynoso's evidence "eliminate[s] the possibility that the crime occurred as set forth by the prosecution at trial", it "would not carry significant weight with the jury", and it does not undermine Reynoso's motive or "remove him from the scene of the murder," and therefore he has not met his burden. *See Goldblum v. Klem*, 510 F.3d 204, 234 (3d Cir. 2007) (such evidence does not meet the *McQuiggin* innocence standard).

---

[5] Items 17 and 18 do not qualify as "new" evidence of innocence. The absence of evidence is not evidence at all. Any evidence the Commonwealth does not possess now, it also did not possess at the time it obtained a guilty verdict, and therefore the evidence's absence is not "new." Moreover, Tom Griffin's affidavit is not "new" evidence because Reynoso's current story explaining the forgery of his passport stamps, if true, was known to him at the time of his trial, and there is no allegation that trial counsel was ineffective for failing to hire an expert to pursue this theory. Therefore, under the *Reeves* test, this evidence is not new. *Reeves v. Fayette SCI*, 897 F.3d 154, 164 (3d Cir. 2018) (evidence is "new" when it is newly discovered or when it was known to the petitioner at the time of trial but "petitioner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that demonstrates his actual innocence…").

[6] This Court has already found items 12 (Sarah Robinson's recantation),13 (Sam Wilkerson's recantation), 14 (Juan Andino's affidavit) and 15 (Marisol Colon's affidavit) to be unreliable in its previous report and recommendation (ECF No. 23 at 12–22), and none of Reynoso's additional evidence changes the factors this Court used to find those items to be unreliable.

Each category of evidence that Reynoso argues establish his innocence will be discussed in turn.

**Evidence Implicating Chuito**

First, Reynoso argues that Sarah Robinson and Sam Wilkerson's recantations support his claim of innocence. But Robinson and Wilkerson's recantations are not "mutually corroborating" and therefore do not "bolster the reliability" of each other as required by *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 61 (3d Cir. 2020). Sarah Robinson, who testified at trial that Reynoso committed the double-murder, now claims that she saw Chuito do the shooting. Appx162–69, 183–85. However, Sam Wilkerson's testimony at the PCRA hearing contradicts Robinson's statement because he testified that Sarah Robinson was not present for the shooting. N.T. 8/13/13 at 45. For his part, Sam Wilkerson, who had also testified at trial that Reynoso committed the double-murder, initially told defense investigators after trial that he did not know who did the shooting, but then at the PCRA hearing, after Sarah Robinson had already pointed the finger at Chuito, he testified that he saw Chuito commit the murder. N.T. 8/13/13 at 70–71. This is not the sort of reliable, interlocking recantation evidence that would meet Reynoso's burden of proving his innocence.

Reynoso's supplemental petition additionally argues that (1) a note in the homicide file derived from unknown source(s) mentioning Chuito and Papadito as the men responsible for the murder, and (2) Juan Andino and Marisol Colon's affidavits describing Chuito's motive for the murder, support his innocence. But additional evidence that Chuito had a motive for the crime, or was somehow involved with the shooting, does not prove Reynoso's innocence because it does not eliminate the prosecution's theory at trial which was that Reynoso killed the victims in retaliation for slights against Chuito, his drug boss. Additional evidence that Chuito had a motive to kill the victims or was otherwise involved in the murder does not establish that Reynoso is innocent but only underscores why Reynoso, who worked for Chuito's drug operation, would also have had a motive for murder.

Moreover, Reynoso argues that the note in the homicide file implicating Chuito and "Papadito" is exculpatory, notwithstanding the fact that it was established at trial that Reynoso's nickname is Papadito, because "Papadito" may have actually referred to Felo Garcia. ECF No. 71 at 95.  This is even though both Sarah Robinson and Sam Wilkerson testified at trial that Reynoso was the "Papadito" who committed the double murder. And this is even though two of Reynoso's own character witnesses, including his

brother, referred to him unprovoked as "Papadito" at trial, eliminating the possibility that the prosecution was wrong that Reynoso was known as Papadito. N.T. 6/28/96 at 10, 11, 18.

Reynoso also argues that Marisol Colon's July 2011 affidavit and her later statements to the *Philadelphia Inquirer* support his innocence because she is a sister to one of the victims and she stated that when she confronted Chuito shortly after the murder asking him why he killed her brother, Chuito responded: "Don't worry about it. I did you a favor." Appx178–80. Marisol Colon interpreted this statement to mean that Chuito was the actual shooter, but assuming this encounter happened the way Marisol Colon described, this response could simply reflect that Chuito had participated in the murder by sitting in the backseat of the car Reynoso shot from (as testified to at trial), and not that Chuito was, himself, the shooter.

Reynoso additionally asserts that he could not have committed the murders because he had a mustache and none of the witnesses at trial said the shooter had a mustache. This is untrue. Sam Wilkerson testified that Papadito, whom he identified as Reynoso, was the shooter and that Papadito had a thick mustache. N.T. 6/25/96 at 91; N.T. 6/26/96 at 55.

In short, none of Reynoso's evidence implicating Chuito eliminates the prosecutions' theory at trial that Reynoso committed the murders in retaliation for slights against his drug boss Chuito, and therefore this evidence does not establish Reynoso's innocence.

**Alibi Evidence**

The thrust of Reynoso's alibi argument is found in the section of his supplemental petition called "the absence of evidence":

> The absence of evidence also places Pedro in the DR from July 13, 1991 through July 27, 1991 and beyond.
>
> Based on the eyewitness and documentary evidence, Pedro [Reynoso] entered the DR on July 13, 1991. The DAO— at trial and during post-conviction proceedings—didn't and hadn't disputed or undermined Pedro [Reynoso]'s claim he entered the DR on July 13, 1991. There's also no dispute the double-murder occurred on July 23, 1991 around 1:15 p.m. Lastly, it's indisputable Pedro [Reynoso] attended his son's baptism in the DR on July 27, 1991. The baptism photographs and alibi statements make this undeniable.
>
> Consequently, for the DAO's homicide narrative to be true, Pedro [Reynoso] had to have exited the DR and reentered the U.S. on or before July 23, 1991, committed the double-murder on July 23, 1991, and reentered the DR on or before July 27, 1991. This narrative is absurd, implausible, and unsupported by any facts.

ECF No. 71 at 73.

This is almost identical to the argument made in closing by trial counsel—an argument that the jury rejected when it convicted Reynoso. Trial counsel argued: "What, did he fly all night? He went down on the 13th, flew

back to Philadelphia, committed two murders, flies back to the Dominican Republic for a baptism of his child [on July 27th]? Is that what they are going to argue?" N.T. 7/1/96 at 44–45.

In his supplemental petition, Reynoso argues that the Commonwealth never disputed this narrative at trial or since, and that this supports his innocence claim. But the fact that the Commonwealth did not dispute this narrative at trial shows that it is likely that the jury accepted this narrative when convicting Reynoso for the murders. That is, the jury must have found that Reynoso found a way to get from the Dominican Republic to the United States at some point between July 13, 1991 (when Fr. De La Cruz met Reynoso at the airport entering the DR) and July 27, 1991 (when Fr. De La Cruz saw Reynoso at his son's baptism) to commit the murder on July 23, 1991, all without any stamps in his passport showing his travel.

The question then becomes: Is Reynoso's new alibi evidence so strong that every single juror, if presented with it, would flip their vote from guilty to not guilty? *See Goldblum v. Klem*, 510 F.3d 204, 227 (3d Cir. 2007) ("the question comes down to this: In the context of a reasonable juror's review of all of the evidence, is the [new evidence] so persuasive and exculpatory that all 12 members of a jury who voted to convict [the petitioner] of first-degree murder now would change their minds to the end that it is more

19

likely than not that none of them would vote to convict?"). The answer to this question is no.

First, Reynoso already presented two alibi witnesses at trial. One of those alibi witnesses was a priest. Therefore, adding additional alibi witnesses, all of whom were either close friends or family of Reynoso, is unlikely to change the jury's calculus. Reynoso argues that in order to convict Reynoso the jury "would have to find that 10 people, including a priest" were lying. ECF No. 40 at 4. But the jury already considered the priest's testimony when finding Reynoso guilty. Moreover, it is not true that the jury would have to find that all the alibi witnesses were lying. Some could have been mistaken regarding the date that they saw Reynoso. Nothing happened in the Dominican Republic on July 23, 1991, the date of the murder, to anchor the alibi witnesses' memory to that date. Because the new alibi witnesses gave their statements at least nine years after the murder, it is not surprising that they may not have accurately remembered the exact date that they saw Reynoso. Assuming Reynoso did fly to the DR on July 13, 1991, a date alibi witnesses would remember due to his travel, and assuming he did attend his son's baptism in the DR on July 27, 1991, another date witnesses would likely remember due to the noteworthy event, that still leaves him sufficient time to return to the United States, commit the

murder, and then get back to the DR, the precise argument made by the Commonwealth at trial. Thus, Reynoso's new alibi witnesses do not eliminate the Commonwealth's trial theory that he was able to move between the United States and the DR undetected, and therefore those witnesses do not meet his burden of proving innocence.

Even more importantly, two pieces of Reynoso's new evidence proves that Reynoso was either able to enter and exit the United States undetected or that he was actually in Philadelphia on the date of the murder. Recanting eyewitness Sarah Robinson said in her September 2021 statement that while she no longer claims that Reynoso was the shooter, she did see him in Philadelphia on the day of the shooting at Chuito's drug house. Appx185. Additionally, in Dr. Ana Luisa Milagros Rosario's August 10, 2020 zoom interview she stated the following:

> Q. (By defense investigator John Butler) I just want to clarify what she said. You said that Pedro accompanied [Reynoso's wife] Catalina to prenatal visits [in 1992 in the DR]?

> A. (through an interpreter) That is correct.

> Q. About how many visits did Pedro attend?

> A. Yes. Because on two or three (interpreter asks her to repeat). I don't know exactly. Two or three. When he was in the country, he would usually accompany her to her evaluations with me, but I can't tell you exactly how many.

Q. (to interpreter) Okay is that everything that she said? Did she say anything else before? It sounded like she said more.

A. (interpreter) She said that he lived in the United States but when he came to visit he would accompany her.

Thus, according to Dr. Rosario, Reynoso moved back and forth between the United States and the DR frequently, and none of those movements are reflected in his passport, proving that Reynoso had some way of getting into or out of the country undetected.

Reynoso argues that to do so he would have had to have been "James Bond," but the DR is located next the Puerto Rico; it is not inconceivable that Reynoso could have taken a ferry between the two islands and then flown domestically from Puerto Rico, which would not have required a passport at all.

Reynoso's own statements upon re-entering the United States likewise undercut his claim that it would have been impossible for him to travel without any evidence in his passport. When apprehended in March 1994, he claimed that he re-entered the United States on July 27, 1991—despite his insistence now that he remained in the DR that day. ECF No. 21 at 34. He then confessed that he was able to bypass customs without obtaining the necessary documentation. *Id.* Thus, petitioner's acknowledged travel between the DR and the United States without

having his passport stamped, negates his argument now that the lack of stamps in his passport proves that he did not commit the murders.

Moreover, Reynoso's shifting story regarding his passport severely undermines his alibi claims. As late as 2017, in his amended habeas petition before this Court, Reynoso was still suggesting that Commonwealth expert Elaine Wooten was wrong that his July 27, 1991 passport stamp was forged. ECF No. 13 at 101 ("Wooten significantly undermined, if not entirely invalidated, her own opinion [that the July 27, 1991 stamp was forged] when she admitted on cross-examination she never compared the 27 Jul 1991 stamp with an exact replica of the date stamp the Dominican Republic used in 1991…"). Now, more than thirty years after the shooting, Reynoso admits that the July 27, 1991 stamp was forged, but he claims it was forged, not to create an alibi, but to defraud immigration authorities. The fact that Reynoso has waited more than thirty years to present this theory suggests that it is not credible. *See Reeves*, 897 F.3d at 161 (the timing of the petitioner's submission bears on its "probative reliability"). Moreover, his latest alibi theory—that he forged the July 27, 1991 and March 10, 1994 stamps to fool immigration authorities—is severely undermined by Elaine Wooten's expert opinion at trial that the March 10, 1994 stamp was genuine. N.T.

6/26/96 at 112. This glaring inconsistency in his current alibi story is not addressed by Reynoso in his supplemental petition or by his immigration expert, Tom Griffin, who himself is not an expert document examiner who could opine as to the authenticity of the stamps.

In short, Reynoso's claim of innocence rests on his assertion that he either could not have returned or did not return to the United States on July 23, 1991 to commit this double murder. It is clear from the evidence described above that Reynoso *could have* returned to the United States undetected, and Reynoso's shifting story does not give Respondents confidence in his assertion that he *did not* return to the United States to commit the double murder. The jury rejected that assertion at trial, and none of the evidence Reynoso has now presented is likely to have changed their mind.

## CONCLUSION

For these reasons, Respondents request that Reynoso's petition be denied as untimely.

Respectfully submitted,


*/s/Katherine Ernst*
Katherine Ernst, Esquire
Assistant District Attorney
Federal Litigation Unit

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PEDRO REYNOSO,** | : | **CIVIL ACTION** |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CYNTHIA LINK,** *et al.* | : | **NO.  16-1721** |
| | : | |
| **Respondents.** | | |

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing supplemental response was served on October 3, 2022 on all counsel of record *via* this Court's CM/ECF electronic filing system.

*/s/ Katherine Ernst*
Katherine Ernst, Esquire
Assistant District Attorney
Federal Litigation Unit