## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **PEDRO REYNOSO** | ) | |
| | ) | |
| Petitioner-Plaintiff, | ) | |
| | ) | |
| v. | ) | 16-cv-1721 |
| | ) | |
| **CYNTHIA LINK,** Superintendent | ) | |
| **DISTRICT ATTORNEY'S OFFICE** | ) | |
| | ) | |
| Defendant-Respondent. | ) | |
| | ) | |

## Reply to Commonwealth's Supplemental Answer

Craig M. Cooley
**COOLEY LAW OFFICE**
1308 Plumdale Court
Pittsburgh, PA 15239
412-607-9346
craig.m.cooley@gmail.com
www.pa-criminal-appeals.com
**Counsel for Pedro Reynoso**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................i

THE DAO'S ARGUMENTS ....................................................................1

    A. The Chuito evidence.....................................................................1

    B. The alibi evidence.......................................................................3

COUNTER-ARGUMENTS REGARDING CHUITO EVIDENCE ..................7

    A. The DAO's *Schlup* analysis is wrong because it didn't consider and weigh the significant credibility concerns inherent in Sarah Robinson's and Sam Wilkerson's pre-trial statements and trial testimony........................................7

        1. Sarah Robinson's July 26, 1991 statement .........................................9

            a. The statement's content .......................................................9

            b. The statement's credibility issues.........................................11

        2. Sarah Robinson's July 29, 1991 statement .....................................16

            a. The statement's content .......................................................17

            b. The statement's credibility issues.........................................18

        3. Sam Wilkerson's July 31, 1991 statement.......................................21

            a. The statement's content .......................................................21

            b. The statement's credibility issues.........................................23

        4. Sarah Robinson's trial testimony.....................................................25

            a. The mustache-less and glasses-wearing driver/gunman ....25

            b. The mix-up in names .........................................................28

         5. Sam Wilkerson's trial testimony .....................................................30

a. No pre-trial identification of Pedro Reynoso...................... 30

b. The mustache-less driver/gunman....................................... 30

B. The DAO's credibility argument is wrong because the DAO didn't acknowledge how the exculpatory facts contained in the suppressed *Homicide Summary* and Marisol Colon's affidavit corroborate Sarah Robinson's and Sam Wilkerson's recantations and identifications of Chuito........................ 32

    1. The *Homicide Summary* corroborates Sarah Robinson's and Samuel Wilkerson's recantations and Marisol Colon's affidavit ................... 39

    2. Sarah Robinson's identification of Chuito corroborates Sam Wilkerson's identification of Chuito and vice versa........................... 43

    3. Marisol Colon's affidavit corroborates Sarah Robinson's and Samuel Wilkerson's recantations – and vice versa ............................. 43

C. The DAO's credibility argument is wrong because it didn't identify – and can't identify – a nefarious motive for Sarah Robinson, Sam Wilkerson, and Marisol Colon to each identify Chuito as the driver/gunman .................... 45

COUNTER-ARGUMENTS REGARDING ALIBI EVIDENCE ..................... 51

A. The DAO didn't consider the substantial cross-corroboration of the alibi evidence........................................................................................................ 51

    1. The alibi witnesses.......................................................................... 52

    2. The documentary and photographic evidence .............................. 57

B. The DAO's – "nothing happened in the D.R." – argument represents a two-headed sword that undercuts the DAO's credibility argument regarding the alibi witnesses and supports Pedro's credibility argument........................ 63

C. The alibi witnesses who provided affidavits during Pedro's initial-review PCRA proceedings are credible because – by providing PCRA affidavits – these witnesses expected to testify under oath at a PCRA hearing and face cross-examination ......................................................................................... 64

D. The DAO's about-face regarding the truthfulness of Pedro's March 24, 1994 INS statement simply shows the DAO is more concerned about gamesmanship and protecting a conviction than about seeking justice and the truth .......................................................................................................... 65

E. The absence of eyewitnesses placing Pedro in the Darrien Street neighborhood corroborates Pedro's alibi evidence ....................................... 67

F. The DAO's emphasis on Dr. Rosario's August 2020 statement is misplaced because Dr. Rosario's statement is consistent with Pedro's narrative and Dr. Rosario only saw Pedro a few times – each of which occurred after the July 13, 1991 to July 27, 1991 time period ..................... 70

*SCHLUP* ANALYSIS ................................................................................................. 71

FEDERAL CLAIMS .................................................................................................. 72

RIGHT TO AN EVIDENTIARY HEARING ....................................................... 72

CONCLUSION .......................................................................................................... 75

# THE DAO'S ARGUMENTS

The DAO's *Supplemental Answer* only addressed the timeliness question regarding Pedro Reynoso's 2254 petition, namely whether the new evidence satisfies *Schlup's* gateway innocence standard. The DAO didn't address Pedro's underlying federal claims because – from its perspective – Pedro's new evidence doesn't satisfy *Schlup's* standard.[1] The DAO is wrong.

***************

The DAO argued Pedro's new facts don't "demonstrate that it is more likely than not that no reasonable juror would have convicted [him] in light of the new evidence[.]"[2] More specifically, the DAO argued Pedro's new facts: (1) don't "eliminate the possibility… the crime occurred as set forth by the prosecution at trial"; (2) "would not carry significant weight with the jury"; and (3) don't "undermine [Pedro's] motive or remove him from the [murder] scene[.]"[3]

To conclude these things, the DAO argued the following.

## A. The Chuito evidence

Regarding the substantial evidence implicating Chuito, the DAO did the following:

---

[1] E.C.F. #77, p. 2 n.2.
[2] E.C.F. #77, p. 2.
[3] E.C.F. #77, p. 14 (cleaned up) (citing *Goldblum v. Klem*, 510 F.3d 204, 234 (3d Cir. 2007)).

- The DAO argued the Chuito evidence only came from "the recanting witnesses," *i.e.*, Sarah Robinson and Sam Wilkerson, which "this Court has already found to be unreliable."[4]

- Next, after decades of claiming only two people were in the perpetrator's car – *i.e.*, Pedro Reynoso and Felo Garcia – the DAO now claimed "Chuito was" – in fact – "in the backseat of the car that [Pedro] shot from."[5]

- Regarding Detective Bentham's suppressed *Homicide Summary* – which identified "Chuito and Popoditto" as the "persons responsible for the murders" – the DAO claimed this statement doesn't actually mean what it states, namely that Chuito committed the double-murder with Popoditto. From the DAO's perspective, this statement simply means "Chuito had a motive for the crime" or "was somehow involved with the shooting" – and because of this – it doesn't "prove [Pedro's] innocence because it does not eliminate the prosecution's theory at trial which was that Reynoso killed the victims in retaliation for slights against Chuito[.]"[6]

- Shortly after Detective Bentham's *Homicide Summary* identified Chuito and Popoditto as the two men who perpetrated the double-murder, the PPD arrested Felo Garcia at the Dominican drug house on July 27, 1991 – and the PPD's arrest report

---

[4] E.C.F. #77, p. 2. As the DAO noted, the Court "has already found already found items 12 (Sarah Robinson's recantation),13 (Sam Wilkerson's recantation), 14 (Juan Andino's affidavit) and 15 (Marisol Colon's affidavit) to be unreliable in its previous report and recommendation." E.C.F. #77, p. 14 n.6 (citing E.C.F. #23, pp. 12–22)).

[5] E.C.F. #77, p. 2.

[6] E.C.F. #77, p. 16.

and criminal complaint identified him as "Popodito."[7]  Despite this exculpatory paperwork and the fact Chuito went only by Chuito, the DAO claimed that – because Pedro's nickname is "Papadito" – this proved he's the "Popodito" identified in the *Homicide Summary*.

- In the end, the DAO claimed "none" of the evidence "implicating Chuito eliminates the prosecution's theory… that [Pedro] committed the murders in retaliation for slights against his drug boss Chuito[.]"[8]

The DAO is wrong.

### B.     The alibi evidence

The DAO argued Pedro "has not established… he was in the DR on the date of the shooting[.]"[9]  To support this position, the DAO argued the following:

- The DAO claimed Pedro's additional alibi witnesses are "largely cumulative" of his trial alibi testimony.[10]  The DAO – effectively – hung its hat on Father de La Cruz's trial testimony.[11] From the DAO's perspective, if the jury didn't believe a priest, it wouldn't believe Pedro's dozen other alibi witnesses because "[s]ome… could have been mistaken regarding the date that they saw [Pedro]."[12]

---

[7] E.C.F. #71-1, pp. 35, 314.
[8] E.C.F #77, p. 18.
[9] E.C.F. #77, p. 3.
[10] E.C.F. #77, p. 3.
[11] E.C.F. #77, p. 20 ("One of those alibi witnesses was a priest.").
[12] E.C.F. #77, p. 20.  This is a remarkable statement, especially considering the substantial credibility issues presented by Sarah Robinson's and Sam Wilkerson's pre-trial statements and trial testimony. There's no evidence supporting the DAO's – "they may be mistaken" – theory, but there's substantial evidence the DAO's linchpin witnesses, *i.e.*, Sarah Robinson and Sam Wilkerson, were, in fact,

- Likewise, the DAO argued because – "[n]othing happened in the [D.R.] on July 23, 1991… to anchor the alibi witnesses' memory to that date" – the alibi witnesses' statements about seeing Pedro repeatedly – day in and day out – between July 13, 1991 (the date Pedro landed in the D.R.) through July 27, 1991 (the date of Pedro's son's baptism) are inherently unreliable.[13]

- The DAO narrowed – significantly – the scope of Pedro' substantial alibi evidence by claiming the "thrust" of his "alibi argument" was the "absence of evidence" argument he made regarding how it would be nearly impossible for him to travel in and out of two countries without being detected and without traveling through a port of entry.[14]

The DAO argued, because the jury convicted Pedro, it "must have [determined] that [he] found a way to get from the [D.R.] to the [U.S.] at some point between July 13, 1991… and July 27, 1991… to commit the murder[s] on July 23, 1991, all without any stamps in his passport showing his travel."[15]  Consequently, because Pedro's jurors convicted him, the DAO believes this proves Pedro had the wherewithal to travel undetected between the D.R. and U.S. sometime before July 23, 1991 until sometime

---

"mistaken" when they told Pedro's jurors Pedro was the driver/gunman.  Consequently, the DAO is fine disregarding the substantial and indisputable credibility problems regarding its own witnesses, *infra*, pp. 7-30, while simultaneously surmising – with no evidence whatsoever – that Pedro's alibi witnesses might be mistaken about when they saw him in the D.R. between July 13, 1991 and July 27, 1991.

[13] E.C.F. #77, p. 20.

[14] E.C.F. #77, p. 18.

[15] E.C.F. #77, p. 19.

before July 27, 1991 – where photographs indisputably place him in the D.R. at his son's baptism.

- During her August 10, 2020 Zoom interview with both parties, Dr. Ana Luisa Milagros Rosario, Catalina Reynoso's pre-natal doctor, said the following:

> Q. (By defense investigator John Butler) I just want to clarify what she said. You said that Pedro accompanied [Reynoso's wife] Catalina to prenatal visits [in 1992 in the DR]?
>
> A. (through an interpreter) That is correct.
>
> Q. About how many visits did Pedro attend?
>
> A. Yes. Because on two or three (interpreter asks her to repeat). I don't know exactly. Two or three. When he was in the country, he would usually accompany her to her evaluations with me, but I can't tell you exactly how many.
>
> Q. (to interpreter) Okay is that everything that she said? Did she say anything else before? It sounded like she said more.
>
> A. (interpreter) She said that he lived in the United States but when he came to visit he would accompany her.[16]

- The DAO argued this portion of Dr. Rosario's statement proved Pedro "moved back and forth between the [U.S.] and the [D.R.] frequently, and none of those movements are reflected in his passport, proving that [Pedro] had some way of getting into or out of the country undetected."[17]

- The DAO continued with this – James Bond-type – argument by claiming:

---

[16] E.C.F. #77, pp. 21-22 (quoting 8/10/2020 Zoom interview).
[17] E.C.F. #77, p. 22.

> [T]he DR is located next the Puerto Rico; it is not inconceivable that Reynoso could have taken a ferry between the two islands and then flown domestically from Puerto Rico, which would not have required a passport at all.[18]

- The DAO then focused on Pedro's March 24, 1994 INS statement,[19] where he told an INS agent he went through U.S. customs in Puerto Rico on July 27, 1991– but when he did – the U.S. customs agent didn't imprint an "admission stamp" on his passport. The INS agent didn't believe Pedro – and the DAO at trial didn't believe him because the prosecutor hammered him for lying to the INS agent.[20] Now, however, the DAO believes Pedro's INS statement is true, meaning Pedro credibly "confessed" he had the ability "to bypass customs without obtaining the necessary [stamps and/or] documentation."[21]

- In the end, the DAO argued:

> It is clear from the evidence described above that Reynoso *could have* returned to the United States undetected, and Reynoso's shifting story does not give Respondents confidence in his assertion that he *did not* return to the United States to commit the double murder. The jury rejected that assertion at trial, and none of the evidence Reynoso has now presented is likely to have changed their mind.[22]

*************

The DAO is wrong factually and legally.

---

[18] E.C.F. #77, p. 22.
[19] E.C.F. #21-8.
[20] NT, Trial, 7/1/1996, pp. 63-67.
[21] E.C.F. #77, p. 22.
[22] E.C.F. #77, p. 24.

# COUNTER-ARGUMENTS REGARDING CHUITO EVIDENCE

**A.** **The DAO's *Schlup* analysis is wrong because it didn't consider and weigh the significant credibility concerns with Sarah Robinson's and Sam Wilkerson's pre-trial statements and trial testimony**

The DAO's *Schlup* analysis is woefully narrow and incorrect. Most notably, the DAO failed to consider the credibility of the "old" evidence presented at trial.

A proper *Schlup* analysis involves the following:

*First*, "[t]o be credible" – a gateway "actual innocence" claim must include "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial[.]" *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *accord House v. Bell*, 547 U.S. 518, 537 (2006).

*Second*, "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House v. Bell*, 547 U.S. at 537-538 (quoting *Schlup v. Delo*, 513 U.S. at 327-328).

*Third*, based on "this total record," the habeas court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup v. Delo*, 513 U.S. at 329; *House v. Bell*, 547 U.S. at 538. The Court's "function," consequently, isn't "to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.* Put differently, because a gateway "actual innocence" claim "involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how

reasonable jurors would react to the overall, newly supplemented record." *House v. Bell*, 547 U.S. at 538.

*Fourth*, like *Schlup's* gateway innocence standard "does not require absolute certainty about the petitioner's guilt or innocence." *House v. Bell*, 547 U.S. at 538.

Consequently, when adjudicating a *Schlup* gateway claim, the Court must examine the "old" trial evidence and "new" evidence – and assess how the "new" evidence would've likely impacted the "old" trial evidence used to convict the petitioner. Thus, this requires the Court to assess the credibility of the "old" trial evidence. Sure – because the Court is conducting a *Schlup* analysis, the "old" trial evidence obviously produced a conviction.

Simply because the "old" trial evidence produced a conviction, doesn't mean the "old" trial evidence is immune to – or has no – credibility issues. This case is no exception because Sarah Robinson's and Sam Wilkerson's pre-trial statements and trial testimony presented with significant credibility issues. The DAO, however, didn't incorporate these substantial credibility concerns into its *Schlup* analysis.

By not assessing the credibility of the "old" trial evidence, the DAO incorrectly – and purposely – enhanced the credibility and strength of the "old" trial evidence used to convict Reynoso. The DAO then used this false – strengthen of evidence claim – to erroneously conclude Pedro's new credible facts can't – and don't – satisfy *Schlup's* standard. Had the DAO acknowledged and considered the significant credibility issues contained in – and produced by – the "old" trial evidence, it would've concluded what

Pedro concluded: had his jurors known about his new credible facts – and compared them to the old incredible or questionably credible trial facts – it's more probable than not that no reasonable factfinder would've convicted him of the double-murder. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *House v. Bell*, 547 U.S. 518, 538 (2006); *Schlup v. Delo*, 513 U.S. 298, 329 (1995); *Reeves v. Fayette SCI*, 897 F.3d 154, 160 (3d Cir. 2018); *Houck v. Stickman*, 625 F.3d 88, 93 (3d Cir. 2010).

### 1.    Sarah Robinson's July 26, 1991 statement

Sarah Robinson's credibility issues started from the get-got – with her July 26, 1991 statement to Detective Gross.[23]

### a.    The statement's content

Robinson said she knew Carlos Torres and Charles Rivera.   She knew Torres as Popo.  Robinson then described the shooting and said she was on Darien Street, near the intersection of Clearfield Street, when she heard two Dominican men arguing.  One was Torres and the other was someone she knew as <u>Marciano</u>.   Robinson heard <u>Marciano</u> state to Torres, in English, "I am going to kill you."  Torres then got into his car and told <u>Marciano</u> "he was going to take his [*i.e.*, Marciano's] drugs."  Torres then "drove his [car] twice around the block speeding down the street."  After Torre drove around the second time, Robinson heard <u>Marciano</u> yell, "Move everybody off the street, I'm going to catch him on 9th Street, I'm going to kill him."

---

[23] E.C.F. #71-1, pp. 53-59

Robinson said she then walked to the corner of 9th Street and Clearfield Street and stood there. About ten minutes later, Robinson saw Torres park near the corner. When Torres parked, Robinson noticed another Dominican male in the front passenger's seat – Charles Rivera. Thirty seconds after Torres parked, Robinson saw Marciano driving a "tan auto with a beige top." She saw Marciano drive up behind Torres's car and slam on the breaks in such a way to block Torres's car. Robinson then saw Marciano produce a handgun, point it out the driver's side window, and fire into Torres's car. She saw Rivera get shot several times. Robinson then saw Torres turn the steering wheel as if he were trying to drive off, but Marciano had "used his car to ram" Torres's car. Robinson then saw Marciano point a different gun out the driver's side window and fire several more shots into Torres's car, before speeding off down Clearfield Street.

Robinson said she saw another Dominican male in the front passenger's seat of Marciano's car who she knew as Papodito. Robinson said she'd known Marciano for one year and Papodito for several years and she knew both sold drugs from 3042 North Darien Street.

Robinson described the driver/gunman, *i.e.*, Marciano, as Dominican in his 40's, 5'3" to 5'5", medium build, with thick black curly hair that's close cut around the ears with a short "fuzzy tail," and a light complexion, who wears glasses and a "rope chain" earring.

Robinson described the front passenger, *i.e.*, <u>Papodito</u>, as Dominican in his 40's, 5'3" to 5'4", with husky build, black to dark brown hair with graying on the sides, with curly hair, a mustache, and with a very dark complexion.

Robinson also said she saw <u>Papodito</u> that day – July 26, 1991 – around 9 a.m. at the 3042 North Darien Street residence and <u>Marciano</u> at 9:15 a.m. that day. More importantly, Robinson said both stayed at the drug house until 9:30 p.m. on July 26, 1991: "<u>They come every day at about 9 a.m. & stay till 9:30 p.m. except for Sundays they close [at] 5 p.m.</u>"[24]

### b.    The statement's credibility issues

Robinson's statement is chalk-full of credibility issues:

*First*, according to Robinson, she'd known Papodito for several years, meaning one would think she could easily identify the person she knew as Papodito. However, if Pedro Reynoso is Papodito, then – according to this statement – Pedro was the front passenger, not the driver/gunman. Put differently, if Robinson had known Papodito for several years, the likelihood of her misidentifying him was slim to none.

*Second*, Robinson described Papodito as having curly hair. Pedro Reynoso, however, didn't have – and has never had – curly hair, as evidenced by the photographs from his son's July 27, 1991 baptism.[25]

---

[24] E.C.F. #71-1, p. 58.
[25] E.C.F. #71-1, pp. 152-153.

*Third*, while Robinson described Papodito as having a mustache, she described Marciano, *i.e.*, the driver/gunman, as not having a mustache. As explained below, the absence of a mustache on the person who Robinson identified as the driver/gunman creates another significant credibility issue because – during her July 29, 1991 follow-up statement – Robinson claimed Papodito was the driver/gunman, not Marciano. Thus, if Pedro is Popodito, and Popodito is the driver/gunman – then the driver/gunman still doesn't have a mustache according to Robinson. This isn't only problematic – it's exculpatory because Pedro had a full-blown mustache on July 27, 1991 – only four days after the double-murder.

*Fourth*, according to Robinson, she saw Marciano and Papodito at the drug house on the morning and evening of July 26, 1991. As noted, Robinson said both stayed at the drug house until 9:30 p.m. on July 26, 1991: "They come every day at about 9 a.m. & stay till 9:30 p.m. except for Sundays they close [at] 5 p.m."[26]

Consequently, according to Robinson, if Pedro is Papodito or even Mariano, this meant Pedro had to have – somehow – traveled back to the D.R. from Philadelphia in less than fifteen hours because he attended his son's late morning/early afternoon baptism on July 27, 1991 in Pimentel, D.R. – and he's produced indisputable photographic evidence of his attendance.

---

[26] E.C.F. #71-1, p. 58.

The only conceivable way Pedro could've traveled between Philadelphia and Pimentel – between 10 p.m. on July 26, 1991 and noonish on July 27, 1991 was to fly. However, if Pedro flew, he would've had to have traveled through a port of entry, *i.e.*, an airport, in the D.R., which would've placed an "entry" stamp on his D.R. passport <u>dated July 27, 1991</u>. The "entry" stamp would've had to be for July 27, 1991 because there's no possible way Pedro could've left the drug house at 9:30 p.m. on July 26, 1991, traveled to either Philadelphia's airport or Newark's airport, and taken a (direct or indirect) flight into the D.R. – where he would've landed in the D.R. before 11:59 p.m. on July 26, 1991.

To date, the DAO has never – once – acknowledged this substantial and exculpatory July 26, 1991 – drug house sighting – by Robinson. This, however, is unsurprising because, by acknowledging it, the DAO would've had to explain how Pedro could've possibly traveled between Philadelphia and Pimentel – <u>in less than fifteen hours</u> – without traveling through a port of entry in the D.R. where he would've had his D.R. passport stamped with a D.R. "entry" stamp <u>dated July 27, 1991</u>.

While the DAO spent considerable time pontificating about the ways in which Pedro "frequently" traveled between the U.S. and the D.R. "undetected,"[27] Robinson's July 26, 1991 – drug house sighting – sinks the DAO's outlandish – "Pedro took a ferry boat" – narrative. According to the DAO,

---

[27] E.C.F. #77, pp. 19-21.

> [T]he DR is located next the Puerto Rico; it is not inconceivable that Reynoso could have taken a ferry between the two islands and then flown domestically from Puerto Rico, which would not have required a passport at all.[28]

Thus, based on the DAO's – "Pedro took a ferry boat" – narrative, after Pedro left the Darrien Street at 9:30 p.m. on July 26, 1991, he did the following: (1) traveled to either Philadelphia's airport or Newark's airport; (2) took a flight to – presumably – San Juan, Puerto Rico; (3) once in San Juan, Pedro left the airport and traveled to a boat – presumably – docked near San Juan; (4) Pedro then took said boat from San Juan to somewhere along the D.R.'s eastern coast – maybe Samana; and (5) once in Samana, Pedro drove to Pimentel, where he arrived in time for his son's late morning/early afternoon baptism on July 27, 1991.



---

The travel time between Samana, D.R. and Pimentel, D.R. is two hours.



Keep in mind, the DAO claimed – with a straight face – that Pedro accomplished all this travel in less than fifteen hours: from 9:30 p.m. on July 26, 1991 (when he left the drug house) until noonish on July 27, 1991 (when he arrived at his son's baptism in Pimentel). The logistical absurdity of the DAO's – "Pedro took a ferry boat" – narrative speaks for itself.

Moreover, the DAO's – "Pedro took a ferry boat" – narrative is buttressed by pure speculation instead of concrete and credible evidence. Put differently, the DAO presented no credible evidence proving Pedro "frequently" – or even once – traveled between the D.R. and the U.S. "undetected." Indeed, if Pedro had the ability to "frequently" travel between the U.S. and D.R. "undetected," why on God's green Earth did he travel through Newark's airport, *i.e.*, a major international port of entry, on March 24, 1994 – where he'd definitely be "detected" by U.S. authorities – especially if he committed a double-murder in Philadelphia on July 23, 1991? The answer is simple:

Pedro didn't travel between the U.S. and D.R. undetected. Once Pedro landed in Santo Domingo, D.R. on July 23, 1991, he stayed in the D.R. until March 24, 1994.

## 2. Sarah Robinson's July 29, 1991 statement

On July 27, 1991, the PPD arrested Felo Garcia.[29] The PPD's arrest report identified Felo Garcia's alias as "Popodito."[30] Someone, therefore, had to have identified Felo Garcia as "Popodito." The PPD and DAO, however, has never disclosed the identity of the person who identified Felo Garcia as Popodito.[31]

---

[29] E.C.F. #71-1, p. 36.
[30] E.C.F. #71-1, p. 36.
[31] Based on Sarah Robinson's 2010 affidavit, the person who identified Felo Garcia as "Popodito" on July 27, 1991 – is presumably Sarah Robinson. In her affidavit, Robinson described how the PPD told her it was going to "raid" the Darrien Street drug house. Once raided, the PPD would then bring out the Dominicans for Robinson to identify. If she "fingered" the Dominicans, the PPD told her it would take care of her pending criminal cases. Robinson did as instructed: "Whoever they brought out of the house, I fingered them." E.C.F. #71-1, p. 165.

THAT THEY WERE GOING TO RAID THE HOUSE AND
EVERYBODY THAT THEY GOT OUT OF THE HOUSE "YOU
FINGER THEM" AND I WOULD NOT HAVE TO WORRY
ABOUT MY 2 CASES AND WOULDN'T HAVE TO WORRY
ABOUT GOING TO PROBATION OR GETTING LOCKED UP
OR NOTHING LIKE THAT. THEY ALSO TOLD ME
THAT ANYTHING I NEED OR WANTED THEY WOULD MAKE
SURE I HAD IT. THAT'S WHAT I DID. WHOEVER THEY
BROUGHT OUT OF THE HOUSE, I FINGERED THEM. I TRIED
TO TELL THEM ABOUT CHUTO AND FELO IN THE CAR.
THEY PAID NO ATTENTION AND JUST DROPPED
EVERYTHING ABOUT CHUTO EVERYTHING. I TOLD
THEM WHO IT WAS.

## a. The statement's content

Based on Sarah Robinson's 2010 affidavit, she identified Felo Garcia as Popodito on July 27, 1991 – when the PPD raided the drug house and arrested Felo Garcia. By July 27, 1991, moreover, Detective Bentham had identified the two men responsible for the double-murder: <u>Chuito and Popodito</u>. Thus, based on Sarah Robinson's July 27, 1991 identification of Felo Garcia as Popodito, she identified Felo Garcia as the front passenger – not the driver/gunman. The driver/gunman, therefore, had to be Chuito.

On July 29, 1991, however, Detective Bentham – the detective who wrote the *Homicide Summary* and identified <u>Chuito and Popodito</u> as the two men responsible for the double-murder – re-interviewed Robinson and asked her: "Was everything that you told us on Friday (July 23, 1991) correct?" Robinson answered – "yes" – but claimed she'd "mixed-up" the names, meaning the "person that shot Pappo (*i.e.*, Carlos Torres) is named Papodito and the person you arrested is Marciano."[32] Robinson added: "Popodito. He's the guy that shot Torres and the other guy."[33] Robinson claimed Felo Garcia was "Marciano" – who she identified as "the other guy in the car with [Popodito]."[34]

---

[32] E.C.F. #71-1, p. 60.
[33] E.C.F. #71-1, p. 60.
[34] E.C.F. #71-1, p. 60.

Robinson, consequently, claimed her July 27, 1991 identification of Felo Garcia as Popodito was only partially correct: Felo Garcia was the front passenger but his nickname wasn't Popodito, it was Marciano. She claimed the driver/gunman was Popodito.

### b.     The statement's credibility issues

Sarah Robinson's credibility issues only grew more substantial with this statement.

*First*, according to Robinson's July 26, 1991 statement, she'd known Popodito for "several years":

> A He Just works AT The Drug house, He's only Been Around ABOUT A year, I've Been knowing PoPidiTo several years. [35]

If Robinson had known Popodito for "several years" before July 26, 1991 – then how'd she misidentify Felo Garcia as Popodito? That simply wouldn't happen. Put differently, if Robinson knew Pedro Reynoso for "several years" – she wouldn't have misidentified him as "Marciano." In short, nothing makes sense about Robinson's – "I mixed-up their names" – explanation/excuse, unless – of course – she and the PPD were trying to protect Chuito, which is a very real possibility – and this leads to the second substantial credibility problem.

---

[35] E.C.F. #71-1, p. 56.

*Second*, based on Detective Bentham's *Homicide Summary*, someone identified Chuito and Popodito as the two men responsible for the double-murder. Marisol Colon has always said she told the PPD about Chuito's post-shooting confession to her. The PPD, though, never disclosed any statements from Marisol Colon. The PPD, however, disclosed two statements from Sarah Robinson: her July 26, 1991 and July 29, 1991 statements. Here's the problem, though: Robinson's "disclosed" statements only mention Marciano and Popodito. Neither mentions Chuito. In fact, there are no statements in the PPD's H-file identifying the person(s) who fingered Chuito as the driver/gunman. Based on the circumstantial evidence, however, there's a strong reason to believe Sarah Robinson identified Chuito as the driver/gunman.

Here's the real problem, though: Based on Sarah Robinson's 2010 affidavit, she identified Felo Garcia as Popodito on July 27, 1991 – when the PPD raided the drug house and arrested him. According to Robinson's July 26, 1991 statement, though, Popodito was the front passenger, meaning when Robinson identified Felo Garcia on July 27, 1991 – she identified him as the front passenger, not the driver/gunman. By July 27, 1991, furthermore, Detective Bentham had identified Chuito and Popodito as the two men responsible for the double-murder. Accordingly, based on Robinson's July 27, 1991 identification of Felo Garcia as Popodito, *i.e.*, the front passenger, this meant Chuito had to be the driver/gunman.

This leads us back to Detective Bentham's July 29, 1991 follow-up interview with Robinson, and the strong circumstantial evidence that Detective Bentham and the PPD were – for whatever reason – trying to protect Chuito. Based on Sarah Robinson's July 27, 1991 identification of Felo Garcia as Popodito, the PPD had what it needed to arrest and charge Chuito and Felo Garcia. The question, consequently, becomes why'd Detective Bentham go back to Sarah Robinson and not only question her July 27, 1991 identification of Felo Garcia, but also her identification of the driver/gunman? Moreover, why isn't Chuito's name mentioned in any of Detective Bentham's witness statements? These questions not only create substantial credibility problems for Sarah Robinson's two "disclosed" statements, but they also create gigantic credibility problems for Detective Bentham – who testified at Pedro's December 2013 PCRA hearing.

*Third*, by switching roles, Robinson made Popodito the driver/gunman, meaning she made Pedro Reynoso the driver/gunman. This is significant because of how she'd described the driver/gunman in her July 26, 1991 statement:

| Q | DESCRIBE MARCIANO |
|---|---|
| A. | I Think he's in his 40's, short ABOUT 5'3" to 5'5", with Thick curly Black HAIR ThAT'S Close Around The EARS, + A TAIL, A short Fuzzy one. He's LIGHT COMPLEXTED + most of The Time He wears GLASSES Medium weight. SOLID BUILD He Also wears AN EARING LIKE A ROPE CHAIN. [36] |

[36] E.C.F. #71-1, p. 57.

Most notably, Robinson said the driver/gunman didn't have a mustache on July 23, 1991. Pedro Reynoso, though, had a full-blown mustache on July 27, 1991 – and the baptism photographs indisputably prove this fact. Next, Robinson said the driver/gunman had "thick curly black hair" – which Pedro Reynoso has never had – and the July 27, 1991 baptism photographs indisputably prove this fact. Likewise, Robinson said the person she identified as the driver/gunman wore glasses "most of the time." Pedro Reynoso, however, never wore glasses and the baptism photographs indisputably prove this fact. If Pedro "always" wore glasses, as Robinson claimed, he would've worn them for the July 27, 1991 baptism.

<p style="text-align:center">***************</p>

In the end, Sarah Robinson's statements created more questions than answers – and they're chalk-full of significant credibility issues.

### 3. Sam Wilkerson's July 31, 1991 statement

### a. The statement's content

On July 31, 1991, Detective Bentham interviewed Wilkerson.[37]

Shortly before the shooting, Wilkerson said he was standing at the corner of 9th Street and Clearfield Street when he saw Carlos Torres (aka Papo) stop and park near the corner. Wilkerson walked up to Torres and talked with him. Wilkerson said Charles Rivera (aka Charlie Chan) was in the front passenger's seat. Wilkerson said Torres was

---

[37] E.C.F. #71-1, pp. 62-65.

"talking about killing the Dominicans" because the Dominicans had helped the PPD apprehend and lock up his brother-in-law, Ginero (aka Jose Andino).

As Wilkerson spoke with Torres and Rivera, a "small car" pulled alongside Torres's car. Wilkerson claimed he recognized the driver of this car as Papodito. Wilkerson also saw a Dominican male in the front passenger's seat of Papodito's car but didn't know the man's name. Wilkerson said: "[T]hey [*i.e.*, the Dominicans] all live on Darien Street." Wilkerson also claimed he saw another Dominican "in the back seat" because this Dominican male in the back seat rolled down the back window.

Wilkerson then saw Papodito fire five to six shots into Torres's car, prompting Wilkerson to immediately run. Wilkerson heard "more shots" a few seconds later before seeing Papodito drive off down Clearfield Street. When detectives asked Wilkerson "how many people" in Papodito's car "fired shots," Wilkerson said, "I just saw Papodito – then I ran."

Wilkerson described Papodito as in his 30's, with a dark complexion and dark hair, but he didn't describe Papodito as having a mustache.[38] However, despite the fact Detective Bentham supposedly showed Robinson a photograph of Popodito on July 31, 1991, Detective Bentham never showed Wilkerson said photograph, so Wilkerson never identified a specific person as being Popodito on July 31, 1991. Indeed, Wilkerson never identified Pedro Reynoso as Papodito before trial.

---

[38] E.C.F. #71-1, p. 65.

### b.  The statement's credibility issues

Wilkerson's statement – like Robinson's statements – created substantial credibility issues.

*First*, if Popodito is the mustache-less driver/gunman, as Wilkerson claimed, then Pedro Reynoso can't be the driver/gunman because he had a full-blown mustache on July 27, 1991 – only four days after the July 23, 1991 double-murder.

*Second*, when Detective Bentham interviewed Sarah Robinson on July 29, 1991, he showed her a photograph of someone – and Robinson identified this someone as Popodito.

> A. Yes, but I had the names of the two men who were in the car that shot POPPO TORRES mixed up. What I mean by this is the person that shot POPPO is named POPODITO and the person that you arrested is MARCIANO. Now I want you to know that Marciano was in the front seat of the car, the passenger side when POPPODITO shot POPPO. It was my mistake. So the other day when I identified the guy that you arrested, you actually arrested the passenger of the car, which you already knew, but I gave you the incorrect name. The; photograph that you and your partner had in the front seat of the car is the guy that shot POPPO and the other guy in the car with him. Like I said his name is POPODITO. [39]

Despite the fact Detective Bentham had said photograph on July 29, 1991, Detective Bentham didn't present said photograph to Wilkerson on July 31, 1991. Instead, Detective Bentham simply asked Wilkerson if he'd be able to identify Papodito if he saw him again:

---

[39] E.C.F. #71-1, p. 60.



That Wilkerson didn't identified Pedro Reynoso – or anyone for that matter – as being Popodito on July 31, 1991, begs this question: How'd Detective Bentham and the PPD establish that Papodito was, in fact, Pedro Reynoso.  As thoroughly pled in Reynoso's *Supplemental Amended 2254 Petition*, this issue created much consternation for Judge Lerner during Pedro's December 9, 2013 PCRA hearing.[41]  Indeed, Judge Lerner nailed it when he said the following regarding Detective Bentham's arrest warrant:

> THE COURT: I'm trying to find out… how Mr. Reymoseo [sic] was actually identified as the[] shooter or a shooter. This arrest warrant affidavit, for my purposes, sheds no light on that whatsoever.
>
> MS. LABAR: I agree.
>
> THE COURT: I don't see how an arrest warrant was issued for people with names on the basis of what's in here, where people are referred to just by nick names and there is in indication in the affidavit of probable cause how the witnesses who provided the basis for this warrant hook up people who they describe only by nick names how they get hooked up with the two defendants who were actually arrested and prosecuted.[42]

[40] E.C.F. #71-1, p. 64.
[41] E.C.F. #71, pp. 112-118.
[42] E.C.F. #71-1, p. 300 (citing NT, PCRA Hrg., 12/9/2013, pp. 32-33).

24

### 4.     Sarah Robinson's trial testimony

Sarah Robinson testified at Felo Garica's May 1992 and Pedro Reynoso's June 1996 trials. Her testimony during both trials raised substantial credibility issues.

### a.     The mustache-less and glasses-wearing driver/gunman

During her May 14, 1992 testimony at Felo Garcia's trial, Robinson confirmed that her description of the gunman/driver was accurate:

```
 3    Q.   On the 26th of July of 1991.  On that date,
 4    you were asked to describe the driver of the
 5    vehicle, and the description you gave in your own
 6    words is as follows:
 7              "I think he is in his 40's.  Short,
 8    about five foot three, five foot five, with thick
 9    curly black hair, that is close around the ears,
10    and a tail, a short fuzzy one.  He is light
11    complected, and most of the time he wears
12    glasses.  Medium weight, solid build, he also
13    wears an earring like a rope chain."
14    A.   Yes.
15    Q.   That is the description that you gave to the
16    police of the driver of the vehicle?
17    A.   Yes.
18    Q.   And the person who was the one that did the
19    shooting?
20    A.   Yes.                                        43
```

Robinson also confirmed that Papodito, *i.e.*, the gunman/driver, always wore glasses and he had them on at the time of the double-murder:

---

[43] E.C.F. #71-1, p. 226.

```
Q.    When you stepped back of course the only
person you could see then was the driver?
A.    Yes.
Q.    Do you know a man named Chuito?
A.    Yes.
Q.    Chuito wears glasses?
A.    Sometimes he does.
Q.    And did the driver of the vehicle wear
glasses?
A.    Papadito, yes, he wore glasses.
Q.    Whoever that driver was, he wore glasses.
Didn't he?
A.    Yes.
Q.    Have you ever seen Papadito wear glasses?
A.    Yes.                                          44
```

At Pedro's trial, Robinson stuck with her description, including the glasses description:

---

[44] E.C.F. #71-1, pp. 217-218.

Q. Didn't the person who was driving the car that you have identified yesterday as Mr. Reynoso, didn't that person wear eyeglasses, Ma'am?

A. He still do.

Q. Does he have eyeglasses on now?

A. Not right now.

Q. When is the last time you saw Mr. Reynoso to tell this jury that he still wears eyeglasses, can you tell us?

A. To my knowledge he still wear them but he don't have them on now; the last time I saw him, the day of the shooting.

Q. Well, that is ...

A. And a couple -- about a week after that.

Q. So ...

A. He came down to pick his stuff up. That's the last time I saw him.

. . .

Q. You are telling the Ladies and Gentlemen five years later it's your testimony that he still wears eyeglasses; is that correct?

A. Yes.

Q. Was the person that did the shooting on July the 23rd wearing eyeglasses, Ma'am?

A. Yes.

Q. You are sure it's him, right?

A. Positive.

Q. Positive. And he always wears eyeglasses, right?

A. He don't have them on now.

Q. When you saw him on the street back ...

A. He had them on.

Q. I'll ask the question again.

A. Okay.

Q. When you saw this man on the street back in 1991 and before, it's your testimony that he always wore eyeglasses, true?

A. Yes. [45]

[45] NT, Trial, 6/27/1996, pp. 23, 24.

Again, the two key characteristics are: (1) the gunman/driver didn't have a mustache; and (2) the gunman/driver always wore glasses. At the time of the shooting, Pedro always sported a full mustchae and he didn't wear glasses. Indeed, Pedro had a full-blown mustache at his son's July 27, 1991 baptism – only four days after the double-murder – and he's not wearing glasses in the baptism photographs.

### b.    The mix-up in names

On direct-examination, Robinson described how – shortly before the shooting, while standing on the corner of 9th Street and Clearfield Street, a car stopped at the stop sign. Robinson said she approached the car to see if its occupants wanted to buy marijuana. She said the driver's side window was down, which allowed her to peer into the front seat.

As she got four to five feet from the car, she saw Pedro Reynoso (aka Popodito) in the driver's seat and Felo Garcia (aka Marciano) in the front passenger's seat. She said Pedro was wearing glasses.[46] Robinson didn't know if someone was seated in the back seat because the back tinted windows were up. When she saw Pedro, she walked away. Robinson, importantly, said she immediately recognized Pedro because she'd known him from the neighborhood for a "few years" and saw him "once or twice a day."[47]

---

[46] NT, Trial, 6/27/1996, p. 24.
[47] NT, Trial, 6/26/1996, pp. 162, 165, 166, 167, 168, 169.

A "split second" after Robinson saw Pedro in the car,[48] she saw and heard the following:

> After I saw [Pedro Reynoso], he passed past me, I heard something say pow, pow, pow, and then that's when the passenger – the young guy got shot first, and then when he went to swerve the car out, then another gun came out with holes in it and started shooting again.[49]

On cross-examination, trial counsel highlighted her July 26, 1991 alleged "mix-up" with the names: <u>Marciano and Popodito</u>. Robinson said, "I had the names mixed up."[50]   When trial counsel asked, "Well you knew the different people, correct?" Robinson said, "I know the two separate people, I just didn't know their names."[51]

The credibility issue remains the same because Robinson's answer is nonsensical. According to Robinson, she – somehow – knew the names Popodito and Marciano – because she repeatedly used them during her July 26, 1991 statement.   Likewise, Robinson said she'd known the person she – ultimately – identified as Popodito for "few years" because she saw him "once or twice a day" in the neighborhood.   Thus, if Robinson new these two names – and knew the person she ultimately identified as Popodito for years by seeing him at the Darrien Street drug house – how could she have possibly mixed-up the names?

---

[48] NT, Trial, 6/26/1996, p. 164.
[49] NT, Trial, 6/26/1996, p. 164.
[50] NT, Trial, 6/27/1996, p. 49.
[51] NT, Trial, 6/27/1996, p. 49.

### 5. Sam Wilkerson's trial testimony

#### 1. No pre-trial identification of Pedro Reynoso

The PPD had Pedro in custody on March 24, 1994 and his trial didn't start until June 1996 – more than two years later. During these two plus years, neither the PPD nor DAO had Wilkerson view a photo array with Pedro's photograph or an in-person line-up with Pedro.[52]

#### 2. The mustache-less driver/gunman

During his July 31, 1991 statement, when Detective Bentham asked Wilkerson to describe the driver/gunman, the two characteristics that stood out to him were the driver/gunman's age and dark complexion:


[53]

Wilkerson didn't mention any facial hair like a mustache – which is quite telling when one examines Wilkerson's trial testimony. At trial, Wilkerson identified Pedro as the driver/gunman, which confused trial counsel because – as trial counsel noted on cross-examination – Pedro had a "long" and "thick" mustache – and had always had one. Wilkerson agreed and said Pedro had the same type of "long" and "thick" mustache on the day of the double-murder: July 23, 1991:

---

[52] NT, Trial, 6/25/1996, p. 73.
[53] E.C.F. #71-1, p. 64.

```
Q.    Now, are you saying, sir, that the person you

identified as Papadito yesterday had a different hairstyle

back in 1991 than he does today?

A.    It wasn't that clean cut.

Q.    So you raised your hands above your head yesterday

indicating about one inch?

A.    About like that, yep.

Q.    Yes, sir.  And that's the way his hair would have

looked if it was him in '91?

A.    And his moustache was thicker around here like

mines.

Q.    He had a thicker moustache like yours?

A.    Like mine.  Long -- thicker.

Q.    You didn't tell the detectives, sir, that Mr.

Papadito had a moustache, did you?

A.    I don't know.  It been -- I don't know, sir.

Q.    Page 3, sir, of your statement.  The detective says

"What does Papadito look like?"

            "Answer:  He's in his thirties.  He's

dark-complected.  He's got dark hair."

Q.    Is that the extent of the description that you gave

of Papadito, sir?

A.    I guess so, if you got it there, sir.                54
```

Wilkerson's testimony begs this question: If Pedro was the driver/gunman – and the driver/gunman had a "long" and "thick" mustache, why didn't Wilkerson mention this significant facial feature to Detective Bentham on July 31, 1991?  Based on the Occam's Razor principle,[55] the simplest – and presumably correct – reason why Wilkerson didn't include a "long" and "thick" mustache in his July 31, 1991 description is because the driver/gunman didn't have a "long" and "thick" mustache.  Sarah

[54] NT, Trial, 6/26/1996, pp. 55-56.
[55] The Occam Razor principle is the principle that states that the simplest reason for a given condition/problem, is usually the correct reason/answer.

Robinson's description of the driver/gunman supports this simple and correct reason, as Robinson repeatedly testified the driver/gunman didn't have a mustache. Consequently, if the driver/gunman didn't have a "long" and "thick" mustache, Pedro couldn't have been the driver/gunman.

<center>***************</center>

In the end, while the DAO's "old" trial evidence resulted in Pedro's convictions, said evidence had substantial credibility issues – issues the Court must consider and weigh in its *Schlup* analysis.  The Court must also ask this question: Had the DAO played by the rules – and disclosed the *Homicide Summary* and the other PPD documents identifying Felo Garcia as Papodito – could Pedro have used the exculpatory facts contained in these suppressed documents to exploit these significant credibility issues and raise enough doubt where it's more likely than not that no reasonable factfinder would've convicted him of the double-murder?  As explained below, the answer is yes.

**B. The DAO's credibility argument is wrong because the DAO didn't acknowledge how the exculpatory facts contained in the suppressed *Homicide Summary* and Marisol Colon's affidavit corroborate Sarah Robinson's and Sam Wilkerson's recantations and identifications of Chuito**

The DAO's credibility argument regarding Sarah Robinson's and Sam Wilkerson's post-trial identifications of Chuito is straightforward: because the Court already found their recantations unreliable in 2018, they're still unreliable today: "[The Court] has already found already found items 12 (Sarah Robinson's recantation),13 (Sam Wilkerson's recantation), 14 (Juan Andino's affidavit) and 15 (Marisol Colon's

<center>32</center>

affidavit) to be unreliable in its previous report and recommendation (ECF No. 23 at 12–22)."[56] The DAO is wrong.

When the Court conducted its 2018 credibility assessment, it wasn't privy to the exculpatory facts contained in: (1) Detective Bentham's *Homicide Summary,* which identified <u>Chuito and Popodito</u> as the two men responsible for the double-murder;[57] and (2) the PPD paperwork regarding Felo Garcia's arrest, where Felo Garcia is repeatedly identified as Popodito.[58] The Court wasn't privy to these exculpatory facts because the PPD and DAO suppressed them.

The suppression – and the DAO's refusal to acknowledge it and factor it into its *Schlup* analysis – represents the most egregious aspect of the DAO's *Supplemental Answer.*

*First*, the DAO refused to even acknowledge it suppressed the *Homicide Summary* and PPD paperwork identifying Felo Garcia as Popodito. Indeed, this is how the DAO characterized Detective Bentham's *Homicide Summary* and its identification of Chuito and Popodito as the two men responsible for the double-murder:

> [Pedro's] supplemental petition additionally argues that… *a note in the homicide file derived from an unknown source(s)* [sic] mentioning Chuito and Papodito as the men responsible for the [double-]murder… support[s] his innocence.[59]

[56] E.C.F. #77, p. 14 n.6.
[57] E.C.F. #71-1, p. 2.
[58] E.C.F. #71-1, pp. 35-36.
[59] E.C.F. #77, p. 16 (emphasis added).

The DAO's characterization is telling and incriminating because the characterization is so obviously absurd and incorrect. One need only examine the following documents and ask themselves: Do these documents look like an insignificant "note" or a summary of the homicide investigation written by the lead detective?

| HOMICIDE CASE SUMMARY | CITY OF PHILADELPHIA POLICE DEPARTMENT DETECTIVE DIVISION | FILE NO. |
|---|---|---|
| | | DC NO. 91-25-76103 |
| | | H91-265 |

**DEFENDANT**

| NAME | ADDRESS | | |
|---|---|---|---|
| SEE H91-264 | SEE H91-264 | | |
| AGE | WT. | HT. | COL. | DEFORMITY |
| DATE OF OCCURRENCE | TIME OF OCCURRENCE | PLACE OF OCCURRENCE | ☐ INSIDE ☐ OUTSIDE |
| OCCUPATION | WEATHER | STATEMENT ☐ YES ☐ NO | CRIMINAL RECORD ☐ YES ☐ NO |
| WEAPONS (Describe) | | | |

**DECEASED**

| NAME | MARITAL STATUS | ADDRESS |
|---|---|---|
| Charles RIVERA | single | 704 W. Tioga St. |
| AGE 17 | WT. 124 | HT. 5'4 | COL. hispanic | DEFORMITY none |

| | STATEMENT ☐ YES ☒ NO | CRIMINAL RECORD ☐ YES ☐ NO |
|---|---|---|

**POLICE ACTION**

| TIME REPORTED | | TIME ARRIVAL AT SCENE | |
|---|---|---|---|
| POLICE–Date  Time | HOMICIDE–Date  Time | POLICE–Date  Time | HOMICIDE–Date  Time |
| SEE H91-264 | | | |
| HOSPITAL | DATE | TIME | TREATED BY DR. |

| NATURE AND EXTENT OF INJURIES |
|---|
| MULTIPLE GUNSHOT WOUNDS |

| PRONOUNCED BY DR. ASCENSIO | DATE 7-23-91 | TIME 2:00PM | PLACE |
|---|---|---|---|
| DATE AND TIME OF AUTOPSY Dr. HOYER    :11:00AM  7-24-91 | | PATHOLOGIST DR. | |

**TECHNICAL**

| BALLISTICS ☐ YES ☐ NO | CHEMICAL ☐ YES ☐ NO | FINGERPRINT ☐ YES ☐ NO | PHOTOGRAPH ☐ YES ☐ NO | OTHER (Describe) |
|---|---|---|---|---|

**EVIDENCE (LIST)**

| DESCRIPTION | CUSTODY OR LOCATION OF EVIDENCE |
|---|---|
| SEE HOMICIDE CASE SUMMARY ON H91-264 | |

PR (HF)000003

34

r000000(₁8₄) bld

| IDENTIFICATION WITNESSES | | | | |
|---|---|---|---|---|
| NAME | ADDRESS | STATE-MENT | CRIM. RECORD | RELATIONSHIP/REMARKS |
| | SEE SECTION C OF BINDER | | | |

| CIVILIAN WITNESSES | | | | |
|---|---|---|---|---|
| | SEE SECTION C OF BINDER | | | |

| POLICE | | | | |
|---|---|---|---|---|
| RANK | NAME | NUMBER | UNIT | CHARACTER OF |
| | SEE SECTION C OF BINDER | | | |

**SUMMARY**

On 7-23-91 at approx. 1:19 PM, Police responded to a radio call, "REPORT OS SHOOTING, MAN WITH A GUN. ON THE HIGHWAY 900 W. CLEARFIELD ST." Upon arrival of the Police, they found two Hispanic males shot. #1 Male – Carlos TORRES was found outside the driver's side of a Toyota Corolla, Rust in color, PA lic #2AX-502. the second male was found inside the auto on the passenger side. He was identified as Charles RIVERA 17 H/M. Both males were suffering from multiple gunshot wounds. They were transported to Temple Hospital where they were pronounced dead by Dr. Ascencio at 2:00PM.

As a result of investigation, two males who were identified as Chuito and Popoditto were the persons responsible for the murders of the two males.

Warrants of arrest were issued and Felo GARCIA was arrested on 7-27-91.

Male identified as POPODITTO is presently listed as a FUGITIVE.

| INVESTIGATOR ASSIGNED | DATE OF REPORT |
|---|---|
| Det. BENTHAM #9138 - Homicide Div. | |

The following sentence is typed under the SUMMARY section: "<u>As a result of investigation, two males were identified as Chuito and Popodito were the persons responsible for the murder of the two males.</u>"  Moreover, it's the first sentence *after* Detective Bentham summarized the facts of the double-murder.

35

When a veteran homicide detective, like Detective Bentham, writes this sentence on the second page of his *Homicide Case Summary*, under the SUMMARY section, and immediately after summarizing the facts of the double-murder, this doesn't constitute an insignificant "note" and/or "fact." It constitutes the lead homicide detective's summary of the homicide investigation. Consequently, based on Detective Bentham's and PPD's homicide investigation, they spoke with at least one credible witness who identified Chuito and Popodito as the two men responsible for the double-murder. Put differently, if the above sentence represented an insignificant "note" and/or "fact," why'd a veteran homicide detective mention it immediately after summarizing the double-murder?

*Second*, the DAO refused to admit it rigged Pedro's December 9, 2013 PCRA hearing when Detective Bentham testified. The DAO called Detective Bentham to rebut Sam Wilkerson's August 13, 2013 PCRA testimony. The primary issue regarding Wilkerson's PCRA testimony was whether his identification of Chuito as the driver/gunman was credible. The DAO used Detective Bentham's PCRA testimony to argue Wilkerson's identification of Chuito wasn't credible.

The DAO, however, cheated because it didn't disclose Detective Bentham's *Homicide Summary* – or the PPD paperwork identifying Felo Garcia as Popodito – before the August 2013 or December 2013 PCRA hearings.[60] Instead, the DAO suppressed

---

[60] The DAO, as mentioned, had numerous copies of the *Homicide Summary* in its own case file, meaning the DAO – without question – knew about the *Homicide Summary* before the 2013 PCRA hearings.

this information and had Detective Bentham falsely testify he couldn't recall if someone had identified Chuito as the driver/gunman before trial. Had Pedro's (then) PCRA attorney, Michael Ferrell, had the *Homicide Summary* and the PPD paperwork identifying Felo Garcia as Popodito, he could've substantially impeached Detective Bentham and established the credibility of Wilkerson's identification of Chuito as the driver/gunman.

*Third*, the DAO refused to admit its initial *Answer* – filed in June 2017[61] – is replete with instances of prosecutorial misconduct because the DAO repeatedly mocked and castigated Pedro's Chuito evidence and arguments – despite the fact its own case file contained numerous copies of Detective Bentham's *Homicide Summary* and numerous PPD documents identifying Felo Garcia as Popodito.[62] Consequently, the DAO knew the PPD had developed credible evidence implicating Chuito – because why else would Detective Bentham identify Chuito in the *Homicide Summary* – but it didn't mention a word about this evidence and it didn't disclose Detective Bentham's *Homicide Summary* or the PPD reports identifying Felo Garcia as Popodito.

*Fourth*, the DAO refused to acknowledge how the exculpatory facts contained in these suppressed documents (1) corroborated Sarah Robinson's, Sam Wilkerson's, Marisol Colon's, and Juan Andino's statements and affidavits identifying Chuito as the

---

[61] E.C.F. #21.
[62] Counsel acknowledges that the DAO changed administrations in January 2018 – six months after the DAO filed its initial *Answer*. The current administration provided counsel copies of the H-file and DAO file in May 2019.

driver/gunman and (2) significantly undermined Sarah Robinson's and Sam Wilkerson's trial identifications of Pedro Reynoso.

Indeed, the DAO's – "Let's bury our head in the sand" – approach to these suppressed documents reminds counsel of the iconic scene in *The Naked Gun* where Leslie Nielsen's character, Detective Frank Drebin, is standing in front of a building – which is blowing up – telling onlookers, "Please disperse, there's nothing to see here, please disperse."



That the DAO didn't acknowledge these substantial *Brady* violations – or the fact it cheated significantly during the 2013 PCRA hearings – is disturbing.

The DAO's lack of candor, however, isn't the primary issue – which is whether the DAO's *Schlup* analysis is correct. It's not because it didn't acknowledge the cross-corroboration between: (1) Sarah Robinson's and Sam Wilkerson's recantations and Marisol Colon's affidavit; and (2) the *Homicide Summary* and Sarah Robinson's recantation, Sam Wilkerson's recantation, and Marisol Colon's affidavit.

In short, the DAO conducted an item-by-item credibility assessment – instead of a cumulative assessment. Consequently, instead of determining whether there were external facts, *e.g.*, other statements or items of evidence, corroborating Robinson's and Wilkerson's recantations and identifications of Chuito, the DAO simply looked at the four-corners of their recantations and asked whether the internal facts were credible. This was wrong.

1. **The *Homicide Summary* corroborates Sarah Robinson's and Samuel Wilkerson's recantations and Marisol Colon's affidavit**

Again, the Court need only start with Detective Bentham's *Homicide Summary.*[63] Somebody had to tell the PPD and Detective Bentham that Chuito was responsible for the double-murder. This is the only plausible explanation why Detective Bentham – an experienced homicide detective – identified Chuito as being responsible for the double-murder:

---

[63] It's undisputed the DAO had the *Homicide Summary* and the PPD documents identifying Felo Garcia as Popodito because the DAO provided counsel a copy of the DAO case file and the DAO case file had numerous copies of these documents.

39

**SUMMARY**

On 7-23-91 at approx. 1:19 PM, Police responded to a radio call, "REPORT OS SHOOTING, MAN WITH A GUN. ON THE HIGHWAY 900 W. CLEARFIELD ST." Upon arrival of the Police, they found two Hispanic males shot. #1 Male - Carlos TORRES was found outside the driver's side of a Toyota Corolla, Rust in color, PA lic #ZAX-502. the second male was found inside the auto on the passenger side. He was identified as Charles RIVERA 17 H/M. Both males were suffering from multiple gunshot wounds. They were transported to Temple Hospital where they were pronounced dead by Dr. Ascencio at 2:00PM.

As a result of investigation, two males who were identified as Chuito and Popoditto were the persons responsible for the murders of the two males.

Keep in mind, this is the *Homicide Summary* – not some report written by a beat cop who interviewed someone who heard a rumor that Chuito may be involved. Instead, it's the lead homicide detective's opening paragraph summarizing the homicide investigation.

This fact, *i.e.*, identifying Chuito as being responsible for the double-murder, corroborates Sarah Robinson's and Sam Wilkerson's recantations and identifications of Chuito as well as Marisol Colon's affidavit where she said Chuito confessed to killing her brother and Charles Rivera shortly after the double-murder. *House v. Bell*, 547 U.S. at 551 (reliability of statement made well after the crime is enhanced when "the record includes at least some independent support for th[at] statement"); *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 61 (3d Cir. 2020) (recantations found reliable where they accused alternative suspect and there was additional evidence pointing to suspect's guilt); *Munchinski v. Wilson*, 694 F.3d 308, 338 (3d Cir. 2012) (police documents are presumptively credible where they reflect "what were, at the time, non-controversial facts that were recorded by the police themselves."); *Fontenot v. Crow*, 4 F.4th 982, 1037 (10th Cir. 2021) (reliability of new evidence increased where "[c]ontemporaneous police documents also corroborate key details").

Sure, "[a]s a general matter, a recantation in the absence of corroborating evidence or circumstances will probably fall short of the standard of reliability contemplated by *Schlup*." *Howell v. Superintendent Albion Sci*, 978 F.3d at 60. We don't have this situation, however, because Robinson's and Wilkerson's recantations and identifications of Chuito aren't simply corroborated by the *Homicide Summary*, they're also corroborated by other police statements that plainly establish Chuito had the means, motive, and opportunity to commit the double-murder. *House v. Bell*, 547 U.S. at 548 (reviewing similarity between accounts of multiple new witnesses as evidence of reliability); *Howell v. Superintendent Albion SCI*, 978 F.3d at 61 (similarity between witness accounts, including recantations, may increase reliability of accounts).[64]

Motive: In his July 23, 1991 statement,[65] Juan Andino described how Chuito had not only threatened to kill him on the morning of July 23, 1991, but also how Chuito had a clear motive to harm and kill Carlos Torres, *i.e.*, Torres had stolen drugs from the Dominicans, and he was dating Chuito's former paramour.

Motive: In his August 27, 1991 statement,[66] Edward Sanchez described witnessing the pre-homicide shooting between Carlos Torres/Charles Rivera and Chuito near the corner of 9th Street and Clearfield Street. Sanchez described how

---

[64] E.C.F. #71, pp. 20-40 (summarizing this evidence).
[65] E.C.F. #71-1, pp. 11-13.
[66] E.C.F. #71-1, pp. 91-95.

Chuito had fired several shots at Torres's car as it drove through the intersection of 9th Street and Clearfield Street.[67]

Sanchez's eyewitness account, more importantly, is corroborated by Edgar Santiago and Sam Wilkerson. In his July 26, 1991 statement,[68] Edgar Santiago described how he was standing on the corner of 9th Street and Clearfield Street with Sarah Robinson, Robert Corley, Ivan Serrano, Sam Wilkerson, and white boy Johnny – when: (1) Torres pulled up to the corner in his Toyota Corolla; (2) called him (Santiago) over to his Toyota; (3) and told him (Santiago) he'd "just got into a shootout with the Dominicans" and that the Dominicans were "looking for [him]."[69] Wilkerson corroborated this portion of Santiago's statement because – in his July 31, 1991 statement – Wilkerson described how Torres had mentioned Juan Andino's arrest from earlier that morning and how he (Torres) was involved in a shooting with the Dominicans sometime after Andino's arrest.[70]

<u>Means</u>: Juan Andino's and Edward Sanchez's police statements both establish that Chuito had the means, *i.e.*, access to a firearm, to commit the double-murder. In his July 23, 1991 statement, Andino described how Chuito had pulled a .357 magnum on him – earlier that morning – when he (Chuito) found Andino hiding in the basement

---

[67] E.C.F. #71-1, p. 92.
[68] E.C.F. #71-1, pp. 75-78.
[69] E.C.F. #71-1, p. 76.
[70] E.C.F. #71-1, pp. 62-63.

of the abandoned house and reported him to the PPD.[71]   In his August 27, 1991 statement, Sanchez described Chuito's firearm as a black automatic.[72]

Opportunity: Juan Andino's and Edward Sanchez's statements both establish Chuito had the opportunity to commit the double-murder because he was very near the scene of the double-murder that morning and only an hour or so before the double-murder.

### 2.     Sarah Robinson's identification of Chuito corroborates Sam Wilkerson's identification of Chuito and vice versa

Sarah Robinson's identification of Chuito corroborates Sam Wilkerson's identification of Chuito – and vice versa.   This cross-corroboration makes their identifications of Chuito more credible and reliable, *Howell v. Superintendent Albion Sci*, 978 F.3d at 61 ("[M]ultiple recantations may themselves be mutually corroborating evidence, with each one having the potential to bolster the reliability of the others."), but the DAO failed to acknowledge this cross-collaboration in its credibility analysis.

### 3.     Marisol Colon's affidavit corroborates Sarah Robinson's and Samuel Wilkerson's recantations – and vice versa

Marisol is Carlos Torres's sister and was married to Juan Andino in July 1991. In her 2011 affidavit, Marisol described how – as she walked towards Clearfield Street to find her brother and tell him about Chuito's death threat – she heard "gunshots and

---

[71] E.C.F. #71-1, pp. 12-13.
[72] E.C.F. #71-1, p. 93.

saw Chuito in a car pulling away."[73]   Once she learned her brother and Charles Rivera were the victims, Marisol went to the Darrien Street drug house that afternoon (July 23, 1991) and confronted Chuito: "I saw Chuito at the drug house, and I asked him why he had killed my brother.  He indicated: 'Don't worry about.  I did you a favor.'"[74] Furthermore, Marisol said she told the PPD about Chuito: "I told them what I knew, that it was Chuito who shot my brother.  However, I never heard anything more about it."[75]

These statements corroborate Robinson's and Wilkerson's recantations and their identifications of Chuito as the driver/gunman, while Robinson's and Wilkerson's identifications of Chuito corroborate Marisol's statement regarding Chuito's confession.   The DAO, though, didn't acknowledge or incorporate this cross-corroboration into its credibility analysis.   In fact, the only time the DAO mentioned Marisol's affidavit was when it mentioned – in a footnote – the Court's prior ruling finding Marisol's affidavit unreliable.[76]

---

[73] E.C.F. #71-1, p. 179.
[74] E.C.F. #71-1, p. 179.
[75] E.C.F. #71-1, p. 179.
[76] E.C.F. #77, p. 14 n.6.

### C. The DAO's credibility argument is wrong because it didn't identify – and can't identify – a nefarious motive for why Sarah Robinson, Sam Wilkerson, and Marisol Colon would each falsely identify Chuito as the driver/gunman

The DAO doesn't believe Robinson's or Wilkerson's recantations, nor Marisol Colon's affidavit. Consequently, the DAO believes Robinson and Wilkerson fabricated their recantations – while Marisol fabricated her affidavit. The DAO, however, has never identified what benefit Robinson, Wilkerson, and Marisol could receive by fabricating their recantations and affidavit and falsely implicating Chuito. Put differently, the DAO has never identified a motive for why any of these witnesses would lie, particularly Marisol Colon. *House v. Bell*, 547 U.S. at 552 (stating that testimony of actual innocence from those with "no evident motive to lie… has more probative value than, for example, incriminating testimony from inmates, suspects, or friends or relations of the accused"); *Cleveland v. Bradshaw*, 693 F.3d 626, 641 (6th Cir. 2012) (finding new witness's affidavit [Donaphin] reliable because "Donaphin d[id] not have any apparent motive to lie on Cleveland's behalf. Although Donaphin has known Cleveland since childhood because they grew up in the same neighborhood, there is no evidence of any close ties between the two individuals.").

Carlos Torres was Marisol's brother. Consequently, what possible benefit could Marisol obtain by providing a false notarized affidavit exculpating the person the DAO prosecuted and convicted for her brother's murder? Ditto regarding Sarah Robinson and Sam Wilkerson. What benefit(s) could both receive by recanting their trial

testimony and implicating Chuito?  Neither received any benefits.  Instead, the DAO has simply assassinated their characters for the last decade – and steadfastly maintained their (extremely problematic) statements and trial testimony represent the truth.

More importantly, when it comes to Robinson and Wilkerson, the Court must consider this question: when it comes to incentivized witnesses like Robinson and Wilkerson, which party, *i.e.*, the prosecution or defense, has the power to produce a narrative consistent with their theory of the crime – but one that's untrue?  The answer is simple – the prosecution.

The motive to fabricate testimony in support of the DAO's theory is far stronger for an obvious reason: the DAO has the power and resources to provide substantial benefits to witnesses, in exchange for their testimony against the defendant(s), particularly those witness facing charges or on parole or probation:

> Prosecutors exercise a remarkable power to give witnesses things of value in exchange for their favorable testimony. These things of value - including broad immunity from prosecution, dropped charges, reduced sentences, or even cash - are given or withheld at the discretion of the prosecutor.  These things of value induce witnesses to testify and to testify in ways that support the Government's theory of the case

Christopher T. Robertson & D. Alex Winkelman, *Incentives, Lies, and Disclosure*, 20 U. Pa. J. Const. L. 33, 34 (2017).

Defendants, like Pedro, however, don't have this remarkable power.

Consequently, the motivation to testify in support of the DAO must be viewed through the prism that "telling a story" – which supports the DAO's narrative – can, will, and does lead to pre- and/or post-testimony benefits to the incentivized witness. Furthermore, even if the DAO doesn't offer benefits to a witness, if the witness *believes* they have a chance of obtaining said benefits – if they provide the "right" narrative to the DAO – the witness will say what they think they need to say to increase their chances of receiving said benefit(s) – even if the narrative is false.

The PPD and DAO wielded this power in this case.

<u>Sarah Robinson</u>:  At Pedro's trial, trial counsel asked Robinson, "[A]fter you testified against [Felo] Garcia you got out of jail, right?"  Robinson said, "Yes."[77]  Also, when she testified against Pedro, she had two "open" criminal cases, but Robinson claimed the DAO didn't make any promises regarding her "open" cases in exchange for her testimony against Pedro.[78]  Based on how the DAO handled Robinson's "open" cases after she testified – Robinson's trial testimony is dubious.

In case number 608201-1992, the PPD arrested Robinson on February 15, 1991 – for a February 14, 1991 auto theft.  However, the PPD didn't file its formal four-count complaint until June 3, 1992 – shortly after Felo Garcia's trial but well before Pedro's trial.  Robinson was held over for trial the same day – June 3, 1992.  On July

---

[77] NT, Trial, 6/27/1996, p. 29.
[78] NT, Trial, 6/26/1996, pp. 170-171.

15, 1997 – a year after Robinson testified against Pedro – the DAO *nolle prossed* all four counts.[79]

In case number 115861-1992, the PPD arrested Robinson on November 6, 1991 for robbery and several other crimes. On January 10, 1992, the PPD filed a thirteen-count complaint against Robinson – at which point she was held for court. The thirteen counts included, *inter alia*, robbery, conspiracy, making terroristic threats, theft, and possessing stolen property. On May 16, 2000, nearly four years after Robinson testified against Pedro, the DAO dismissed seven counts. Robinson had a bench trial on the remaining counts and was convicted of robbery, conspiracy, making terroristic threats, theft, and receiving stolen property. Despite going to trial on these counts, Robinson only received a 1- to 2-year prison sentence for these five felony convictions.[80]

Robinson's 2010 affidavit confirms that she went along with the PPD's and DAO's – "Pedro is Popodito" – narrative because she believed doing so would convince the DAO to drop her pending criminal cases or lead to more favorable outcomes in both cases. This is how Robinson explained her incentive to help the PPD and DAO:

---

[79] E.C.F. #16-81, pp. 2-4.
[80] E.C.F. #16-82, pp. 1-6.

Q. TOM AND JERRY, WHO ARE THEY?
A. 2 COPS. 2 OFFICERS. I DON'T KNOW THEIR REAL NAMES.
TOM & JERRY CAME AND GOT ME. THEY HANDCUFFED ME,
TOOK ME DOWN AND TOLD ME THAT I BETTER TELL THEM
EVERYTHING I KNEW. I TOLD THEM EXACTLY WHAT
I JUST TOLD YOU, BUT THEY SAID "NO!" THEY TOLD ME
THAT THEY WERE GOING TO RAID THE HOUSE AND
EVERYBODY THAT THEY GOT OUT OF THE HOUSE "YOU
FINGER THEM" AND I WOULD NOT HAVE TO WORRY
ABOUT MY 2 CASES AND WOULDN'T HAVE TO WORRY
ABOUT GOING TO PROBATION OR GETTING LOCKED UP
OR NOTHING LIKE THAT. THEY ALSO TOLD ME
THAT ANYTHING I NEED OR WANTED THEY WOULD MAKE
SURE I HAD IT. THAT'S WHAT I DID. WHOEVER THEY
BROUGHT OUT OF THE HOUSE, I FINGERED THEM. I TRIED
TO TELL THEM ABOUT CHITO AND FELO IN THE CAR.
THEY PAID NO ATTENTION AND JUST DROPPED
EVERYTHING ABOUT CHATO [CHUCITO SEE] EVERYTHING. I TOLD
THEM WHO IT WAS.[81]

The PPD, *i.e.*, Tom and Jerry, also weaponized her drug addiction against her by telling her they'd provide her with drugs if she simply went along with their narrative:

Q. WHY IS IT YOU TESTIFIED AT PRELIMINARY HEARING AND
TRIAL THAT PAPAVITO WAS DRIVING THE CAR?
A. TOM AND JERRY - THE POLICE TOLD ME "WHOEVER WE
BRING OUT" PUT IT THIS WAY. I WAS GETTING HIGH.
I WAS WORRIED ABOUT MY NEXT HIT, MY NEXT FIX OR
WHATEVER. IT DIDN'T MATTER TO ME. WHAT THEY TOLD
ME TO DO I DID. "THAT'S THE TRUTH"[82]

[81] E.C.F. #71-1, p. 165.
[82] E.C.F. #71-1, p. 166.

<u>Sam Wilkerson</u>: Like Robinson, Wilkerson presented with pressure points the PPD and DAO exploited to convince him to testify against Pedro. When Detective Bentham interviewed Wilkerson on July 31, 1991, Wilkerson had a pending aggravated assault case in case number 1203081-1990.[83] After Detective Bentham's July 31, 1991 interview, the PPD arrested Wilkerson again on August 13, 1991 and charged him with two drug counts in case number 900921-1991.[84] On September 25, 1991, Wilkerson pled guilty to the five counts in both cases, including the aggravated assault count, but only received a 10- to 23-month prison sentence.

<p align="center">***************</p>

Simply put, there's strong credible evidence Robinson and Wilkerson both testified as they did at Pedro's trial because they expected something – and, in fact, received something – from the PPD and/or the DAO. Conversely, when Robinson and Wilkerson recanted and identified Chuito as the driver/gunman, neither Pedro nor his PCRA attorney, Michael Farrell, offered them anything because neither had the power or resources the PPD and DAO when they initially convinced them to endorse the – "Pedro is the driver/gunman" – narrative.

---

[83] E.C.F. #16-6, pp. 2-5.
[84] E.C.F. #16-7, pp. 2-4.

Thus, Robinson's and Wilkerson's recantations and identifications of Chuito as the driver/gunman, are credible and more reliable than their trial testimony because they very likely premised their trial testimony on the belief that, if they testified consistently with the DAO's theory of the case, the DAO would benefit them in some way. *Lopez v. Miller*, 915 F. Supp. 2d at 407 (finding the State's key witness's recantation more credible than her trial testimony because the State had – before trial – made a deal with her to testify against the petitioner, but the witness recanted under circumstances where she had no incentive to recant).

## COUNTER-ARGUMENTS REGARDING ALIBI EVIDENCE

### A. The DAO didn't consider the cross-corroboration of the alibi evidence

The DAO's credibility arguments regarding Pedro's alibi evidence focused primarily on the alibi witnesses. The DAO's primary argument regarding the alibi witnesses is that their proposed testimony is "largely cumulative" of Father de la Cruz's and Martha Almonte's trial testimony.[85] The DAO is wrong because of the substantial cross-corroboration between these additional alibi witnesses. Likewise, the DAO's credibility analysis is wrong because it didn't consider how the documentary and photographic evidence corroborate Father de la Cruz's and Martha Almonte's trial testimony, the numerous alibi affidavits, and the August 2020 alibi interviews. *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 296 n.23 (3d Cir. 2016) (rejecting a similar

---

[85] E.C.F. #77, p. 3.

"cumulative" or "duplicative" argument – made by the same DAO – in a death penalty case).[86]

## 1. The alibi witnesses

As it did with the Chuito evidence, the DAO didn't consider the cross-corroboration of the alibi affidavits. Instead, it viewed each affidavit in a vacuum – unconnected to the several other affidavits placing him in the D.R. between July 13, 1991 and July 27, 1991 and beyond. The DAO's approach is wrong because the numerous alibi witnesses strongly corroborate each other – thus enhancing and establishing their credibility. Furthermore, because the alibi witnesses are credible, their credibility enhances the credibility of the evidence implicating Chuito as the driver/gunman – and vice versa: the credible Chuito evidence enhances the alibi witnesses' credibility.

For instance, consider the following cross-corroboration regarding the alibi affidavits:

- <u>Miguel Almonte</u>: Miguel's affidavit corroborates Martha Almonte's trial testimony regarding flying from Philadelphia to Santo Domingo, D.R. through San Juan, P.R. with Pedro on July 13, 1991. Miguel's affidavit also corroborates Martha's trial testimony regarding seeing Pedro every day in the DR from July 13, 1991 through

---

[86] In *Dennis*, the Third Circuit rejected the DAO's "duplicative" argument because the new witness's key alibi testimony would've been corroborated by an indisputably credible "time-stamped receipt." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d at 296, n.23.

August 2, 1991. Moreover, Miguel's affidavit corroborates the land sale document regarding the land sale he and Pedro executed on July 17, 1991 at Dr. Bueno's office.[87]

- Ernesto Romano Caba: Ernesto was Pedro's father-in-law. In his affidavit, Ernesto said he saw Pedro and Catalina twice on July 23, 1991 at his house in Pimentel. He also saw them at least twice-a-day in the days preceding July 23, 1991.[88] These facts corroborate the statements from the other alibi witnesses who said they saw Pedro every day in Pimentel between July 13, 1991 and July 27, 1991.

- Eunice De La Rosa Cabreja: In her affidavit, Eunice said she saw Pedro in Pimentel on July 23, 1991 and the days preceding July 23, 1991.[89] These facts corroborate Ernesto's affidavit as well as the statements from the other alibi witnesses who said they saw Pedro every day in Pimentel between July 13, 1991 and July 27, 1991.

- Dr. Bueno: In his affidavit, Dr. Bueno said he saw Pedro frequently between July 13, 1991 and July 27, 1991, including July 23, 1991. These facts corroborate Ernesto's and Eunice's affidavits as well as the statements from the other alibi witnesses who said they saw Pedro every day in Pimentel between July 13, 1991 and July 27, 1991. Dr. Bueno also described witnessing and executing the land contract between Pedro

---

[87] Detectives interviewed Miguel on June 19, 1996 – shortly before Pedro's trial. Detectives memorialized the interview with a handwritten statement that Miguel signed. E.C.F. #71-1, pp. 125-129. The DAO disclosed Miguel's statement. During the interview, Miguel told detectives how he'd returned to the D.R. on August 28, 1991 and stayed until September 6, 1991, and how he saw Pedro every day in the D.R. during these ten days. *Id.*
[88] E.C.F. #71-1, pp. 143-144.
[89] E.C.F. #71-1, pp. 137-138.

and Miguel Almonte on July 17, 1991.[90]  These facts corroborate Miguel Almonte's affidavit – where he discussed the July 17, 1991 land sale.

- <u>Luis Ernesto Romano Caba</u>: In his affidavit, Luis described how he saw Pedro every day in Pimentel between July 14, 1991 through July 23, 1991.[91]  These facts corroborate Ernesto's, Eunice's, and Dr. Bueno's affidavits as well as the statements from the other alibi witnesses who said they saw Pedro every day in Pimentel between July 13, 1991 and July 27, 1991.

- <u>Minerva Reynoso</u>: Minerva is Pedro's sister.  In her affidavit, Minerva described how Pedro, Martha Almonte, and Miguel Almonte flew from Philadelphia into San Juan, P.R. and then from San Juan, P.R. into Santo Domingo, D.R. on July 13, 1991.[92]  Minerva also described how she, Angel Rondon, Catalina (Pedro's wife), and Juan Alexander (Pedro's son) met Pedro, Miguel and Martha Almonte, and Father de la Cruz at the Santo Domingo airport on July 13, 1991.  The July 13, 1991 airport pick-up corroborates Martha Almonte's trial testimony, Father de la Cruz's trial testimony, and Miguel Almonte's affidavit and June 19, 1996 pre-trial statement to the PPD.[93]

---

[90] E.C.F. #71-1, pp. 139-140.
[91] E.C.F. #71-1, pp. 137-138.
[92] E.C.F. #71-1, p. 145.
[93] E.C.F. #71-1, pp. 125-129.  In his pre-trial statement, Miguel told the PPD he and Martha flew with Pedro from Philadelphia to San Juan, P.R. and then "traveled in a small plane to the Dominican Republic." E.C.F. #71-1, p. 126.

Minerva also described seeing Pedro, Catalina, and Juan Alexander every day from July 13, 1991 through July 21, 1991, and that when she left the D.R. on July 21, 1991, she called Pedro every day in the D.R. thereafter – including July 23, 1991.[94] These facts corroborate statements from the other alibi witnesses who said they saw Pedro every day in Pimentel between July 13, 1991 and July 27, 1991.

- <u>Angel Rondon</u>: Angel is Minerva's husband. In his affidavit, he described the July 13, 1991 pickup at the Santo Domingo airport – where he saw Pedro, Miguel and Martha Almonte, and Father de la Cruz.[95]  The July 13, 1991 airport pick-up corroborates Martha Almonte's trial testimony, Father de la Cruz's trial testimony, Miguel Almonte's affidavit and June 19, 1996 pre-trial statement to the PPD, and Minerva's affidavit.

Angel also described seeing Pedro every day from July 13, 1991 through July 27, 1991 because he, Minerva, and Pedro's family lived in the same house during this time.[96] These facts corroborate Ernesto's, Eunice's, Dr. Bueno's, and Luis's affidavits as well as the statements from the other alibi witnesses who said they saw Pedro every day in Pimentel between July 13, 1991 and July 27, 1991.

---

[94] E.C.F. #71-1, p. 145.
[95] E.F.C. #71-1, p. 146.
[96] E.C.F. #71-1, p. 146.

- <u>Catalina Reynoso</u>: Catalina is Pedro's wife. In her affidavit, Catalina described the July 13, 1991 airport pickup – where she picked up Pedro and met Miguel and Martha Almonte and Father de la Cruz.[97] The July 13, 1991 airport pick-up corroborates Martha Almonte's trial testimony, Father de la Cruz's trial testimony, Minerva's affidavit, Angel's affidavit, and Miguel Almonte's affidavit and June 19, 1996 pre-trial statement to the PPD.[98]

Catalina also described seeing Pedro every day in the D.R. from July 13, 1991 through July 27, 1991 and beyond. These facts corroborate Ernesto's, Eunice's, Dr. Bueno's, Angel's, and Luis's affidavits as well as the statements from the other alibi witnesses who said they saw Pedro every day in Pimentel between July 13, 1991 and July 27, 1991.

Likewise, consider the cross-corroboration regarding the alibi witnesses the DAO interviewed (via Zoom) in August 2020:

<u>Father Dionisio Suarez</u>: In his affidavit and trial testimony, Father de la Cruz described how Father Suarez performed Juan Alexander's July 27, 1991 baptism. During his interview, Father Suarez confirmed Father de la Cruz's trial testimony and affidavit by describing how he officiated Juan Alexander's baptism and how he saw Pedro at the baptism. Father Dionisio's statement corroborates the many alibi

---

[97] E.C.F. #71-1, pp. 148, 312-313.
[98] E.C.F. #71-1, pp. 125-129. In his pre-trial statement, Miguel told the PPD he and Martha flew with Pedro from Philadelphia to San Juan, P.R. and then "traveled in a small plane to the Dominican Republic." E.C.F. #71-1, p. 126.

witnesses who described attending the baptism and described seeing Pedro at the baptism as well as Father de la Cruz's trial testimony.

Efrain Gonzalez: During his interview, Gonzalez described how he attended and photographed Juan Alexander's baptism – and how he photographed Pedro at the baptism. These facts corroborate the statements made by the many other alibi witnesses who attended the baptism.

Anna Roman Deleno: During her interview, Anna described how she was Pedro and Catalina's neighbor in the Pimentel in July 1991. Once Pedro landed in Santo Domingo on July 13, 1991, Anna described seeing him every day throughout July 1991 and thereafter. These facts corroborate the other alibi witnesses who said they saw Pedro in Pimentel from July 13, 1991 through July 27, 1991 and beyond.

### 2. The documentary and photographic evidence

The relevant alibi documents and photographs also enhance the alibi witnesses' credibility and reliability and vice versa: the alibi witnesses' credibility enhance the credibility and reliability of these documents and photographs, *i.e.*, cross-corroboration. The DAO, though, didn't consider this cross-corroboration.

The July 13, 1991 D.R. "entry" stamp: The July 13, 1991 D.R. "entry" stamp in Pedro's passport is valid and the DAO – to date – has presented no evidence to the contrary. Elaine Wooten – the DAO document expert – only opined that the July 27,

1991 D.R. "exit" stamp was fabricated.[99]  Wooten said nothing about the July 13, 1991

D.R. "entry" stamp.  Indeed, the DAO's case file contains the following note between

a DAO investigator and ADA Edward McCann – the prosecutor who prosecuted

Pedro:



As the note states: "The examiner can not [sic] say for certain anything about the

7-13-91 stamp."

[99] NT, Trial, 6/26/1996, p. 110.

Consequently, the valid July 13, 1991 D.R. "entry" stamp corroborates what several alibi witnesses stated: on July 13, 1991, Pedro, Miguel Almonte, and Martha Almonte flew from Philadelphia to San Juan, P.R. where they ran into Father de la Cruz. Pedro, Miguel, Martha, and Father de la Cruz then flew from San Juan, P.R. to Santo Domingo, D.R. – where they were met by Minerva, Angel, Catalina, and Juan Alexander.[100]

The July 17, 1991 land contract:  Pedro and Miguel Almonte executed the July 17, 1991 land contract at Dr. Bueno's office.[101]  The land contract corroborates what Miguel Almonte and Dr. Bueno said in their affidavits: on July 17, 1991, Miguel, Pedro, and Catalina went to Dr. Bueno's office so Miguel could sell Pedro the "property rights" to "Santos Serrano" – a property in Pimentel.[102]  Thus, the land contract and these affidavits place Pedro in Pimentel on July 17, 1991.

The July 30, 1991 approval of Pedro's firearms application: Shortly after entering the D.R. on July 13, 1991, Pedro completed a firearms permit application.  On July 30, 1991, the D.R. government approved the application.[103]  The D.R. government letter documenting the approval corroborates the alibi affidavits and August 2020 statements, placing Pedro in the D.R. from July 13, 1991 to July 27, 1991 and beyond.[104]

---

[100] E.C.F. #71-1, pp. 137-148.
[101] E.C.F. #71-1, pp. 149-150.
[102] E.C.F #71-1, pp. 139-140, 147.
[103] E.C.F. #71-1, pp. 154-155.
[104] E.C.F. #71-1, pp. 137-148.

The baptism certificate and photographs: The baptism certificate and photographs corroborate the alibi witnesses who said they attended the July 27, 1991 baptism in Pimentel and saw Pedro at the baptism.[105]

AA ticket stubs and AA letters: On December 9, 1996, six months after his conviction, Pedro wrote his trial attorney, Louis Savino, asking Savino to send him "all the records" he (Savino) had "pertaining to" his case. Pedro identified specific records, including his AA ticket stubs and the letter AA had sent him apologizing for the delayed departure of his July 13, 1991 flight from Philadelphia to San Juan, P.R.[106] Savino didn't send the requested documents.

On April 20, 1997, Pedro wrote Savino again, requesting the same documents, including the AA ticket stubs and AA letter.[107] Savino never sent Pedro the requested documents. Undersigned counsel (Cooley) spoke with Savino in April 2016, and he had no documents or material from Pedro's case.

Although Pedro doesn't have the AA ticket stubs or AA letter, his letters to Savino constitute reliable evidence these documents exited and Savino had them before, during, and after trial. Pedro's letters, therefore, corroborate the existence of the AA ticket stubs and AA letter – which corroborate his July 13, 1991 D.R. "entry" stamp as

---

[105] E.C.F. #71-1, pp. 151-152.
[106] E.C.F. #71-1, pp. 156-157.
[107] E.C.F. #71-1, pp. 158-160.

well as the testimony and statements from those alibi witnesses who traveled with him from Philadelphia to Santo Domingo, D.R. through San Juan, P.R. on July 13, 1991.

<u>Nallely Massiel Reynoso's birth certificate and Dr. Rosario's letter</u>: Pedro's daughter – Nallely – was born in Pimentel on April 22, 1992. Nallely's birth certificate conclusively proves these facts.[108] Pedro, notably, was present at Nallely's birth because he signed Nallely's birth certificate on April 22, 1992. Moreover, according to Dr. Rosario's February 6, 2020 letter, Pedro accompanied his (then) wife – Catalina – to her pre-natal and pre-delivery appointments and he was present during Catalina's April 22, 1992 c-section.[109]

Nallely's birthday – April 22, 1992 – is exactly nine months after Pedro entered the D.R. on July 13, 1991. Moreover, Nallely's birth certificate and Dr. Rosario's letter corroborate Pedro's statement regarding the fabricated July 27, 1991 D.R. "exit" stamp and Attorney Griffin's expert opinion that Pedro continuously resided in the D.R. from July 13, 1991 until March 23, 1994.

<div align="center">***************</div>

---

[108] E.C.F. #71-1, p. 312. Pedro gave a copy of Nallely's birth certificate to trial counsel because, in his April 20, 1997 letter to trial counsel, Pedro listed Nallely's birth certificate as one of the documents he wanted back from trial counsel. E.C.F. #711, p. 158.

[109] E.C.F. #71-1, p. 310.

Collectively, the alibi affidavits, the August 2020 alibi interviews, the alibi documents, and alibi photographs create a substantial constellation of cross-corroboration. Put differently, that so many credible people, credible documents, and indisputable photographs place Pedro in the D.R. from July 13, 1991 through July 27, 1991 and beyond speaks volumes to the credibility of these witnesses, documents, and photographs.

Consequently, to conclude the alibi witnesses aren't credible, the Court would have to conclude – or better yet, believe – that over a dozen people came forward to falsely claim they saw Pedro in the D.R. on the date of the double-murder. Likewise, the Court would also have to disregard the indisputable documentary and photographic evidence placing Pedro in the D.R. between July 13, 1991 and July 27, 1991 and beyond. Additionally, the Court would have to disregard the credible Chuito evidence, including Detective Bentham's *Homicide Summary*. Lastly, after finding the alibi evidence incredible, it would then have to find the DAO's – "Pedro took a ferry boat" – narrative credible – even though the DAO hasn't presented a scintilla of evidence supporting this nonsensical narrative.

### B. The DAO's – "nothing happened in the D.R." – argument represents a two-headed sword that undercuts the DAO's credibility argument regarding the alibi witnesses and supports Pedro's credibility argument

The DAO never considered the above cross-corroboration. Instead, the DAO's primary credibility challenge focused on its belief that "nothing happened in the [D.R.] on July23, 1991… to anchor the alibi witnesses' memory to that date."[110] The DAO's – "nothing happened in the D.R." – argument, however, represents a two-headed sword for a simple, yet overlooked reason: Had all these family and friends *not seen* Pedro in Pimentel for multiple days during this period, *i.e.*, July 13, 1991 through July 27, 1991, these family and friends would've easily remembered his absence – especially because each knew July 23, 1991 was the date of the double-murder – and reported Pedro's absence in their affidavits and statements. Thus, while "nothing" remarkable may've happened in the D.R. on July 23, 1991, something ordinary happened from July 13, 1991 through July 27, 1991 and beyond: Pedro didn't leave Pimentel during this time period because, had he done so, his friend and family would've reported said absence in their affidavits.

.

---

[110] E.C.F. #77, p. 20.

### C. The alibi witnesses who provided affidavits during Pedro's initial-review PCRA proceedings are credible because – by providing PCRA affidavits – these witnesses expected to testify under oath at a PCRA hearing and face cross-examination

The alibi affidavits attached to Pedro's 2254 petition were obtained in 2000, during Pedro's initial-review PCRA proceedings. Because Pedro's PCRA proceedings were still pending when these alibi witnesses provided their affidavits, they expected to testify at a PCRA hearing where they'd be cross-examined by the DAO. This expectation strongly suggests their affidavits are truthful and credible. *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 113 (3d Cir. 2001) (upholding the District Court's decision to admit an affidavit based in part on the fact that "the declarant was aware of the pending litigation at the time he made the declaration and thus knew that his assertions were subject to cross examination"); *Lopez v. Miller*, 915 F. Supp. 2d 373, 401 (E.D.N.Y. 2013) ("[B]ecause Lopez's post-conviction proceedings were still pending at the time Guido and Rivera provided their affidavits, they presumably expected to be subject to cross-examination on their contents, suggesting to the court that the affidavits were truthful.").

Additionally, that some of the alibi witnesses are Pedro's family members doesn't make their affidavits presumptively suspect or unreliable. *Wright v. U.S. Postal Serv.*, 183 F.3d 1328, 1333 (Fed. Cir. 1999) ("A familial interest, while relevant, is not sufficient to disregard a witness' testimony."); *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996) ("The fact that a lay witness is a family member cannot be a ground for rejecting his or

her testimony."); *Lopez v. Miller*, 915 F. Supp. 2d at 402 (same); *Brownridge v. Miller*, 2010 U.S. Dist. LEXIS 71188, at *6 (E.D.N.Y. July 15, 2010) ("[A]n alibi is not disingenuous merely because it involves family members.").

>    **D.**    **The DAO's about-face regarding the truthfulness of Pedro's March 24, 1994 INS statement simply shows the DAO is more concerned about gamesmanship and protecting a conviction than about seeking justice and the truth**

In an attempt to bolster its – lack of credibility – argument regarding Pedro's alibi evidence, the DAO referred to Pedro's March 24, 1994 INS statement. During his INS interview at Newark airport, Agent Lavarcheck saw the July 27, 1991 D.R. "exit" stamp in Pedro's D.R. passport. When Agent Lavarcheck didn't see a corresponding U.S. "admission" or "entry" stamp he had the following Q/A with Pedro:

> Q. There are no US admission in your passport. How do you explain that?
>
> A. They let me pass, it is in the computer.
>
> Q. It is not in the computer. How do you explain this?
>
> A. I don't know.
>
> Q. How much did you pay for the Dominican Republic stamps in your passport?
>
> A. I did not pay for them, they are real.[111]

---

[111] E.C.F. #21-8, p. 4.

At trial, the DAO repeatedly argued Pedro's statement was a lie and his July 27, 1991 D.R. "exit" stamp was fabricated. Elaine Wooten's testimony[112] and ADA McCann's closing argument make this plain.[113] Moreover, in its initial *Answer*, filed in June 2017, the DAO emphasized Wooten's and Agent Lavarcheck's testimony to argue against the timeliness of Pedro's 2254 petition.[114]

Here, however, the DAO has now latched on to Pedro's answers and claimed they're (now) true and they prove he "credibly" confessed to being "able to bypass [U.S.] customs without obtaining the necessary [admission stamps and/or] documentation."[115] The DAO then used its absurd – "Pedro credibly confessed" – narrative to argue he "frequently" traveled between the U.S. and the D.R. "undetected" – even when he traveled through ports of entry such as major international airports, *e.g.*, San Juan, Newark, and Philadelphia.

The DAO's argument is ridiculous and disingenuous, and its timing is quite telling. Before Pedro provided Attorney Thomas Griffin's comprehensive affidavit, explaining the exculpatory and innocent reasons behind the counterfeit July 27, 1991 D.R. "exit" stamp and March 10, 1994 D.R. "entry" stamp, the DAO never – once – claimed Pedro's INS statement represented the truth. Here, though, because Attorney Griffin's affidavit clearly and comprehensively explained why the fabricator, *i.e.*, the

---

[112] NT, Trial, 6/26/1996, pp. 109-111.
[113] NT, Trial, 7/1/1996, pp. 63-67.
[114] E.C.F. #21, pp. 6-9.
[115] E.C.F. #77, p. 22.

man Pedro paid for the counterfeit passport stamps, selected the July 27, 1991 and March 10, 1994 dates as the counterfeit dates, the DAO has done an about-face regarding Pedro's March 24, 1994 statement.

The DAO's about-face speaks volumes. It simply shows the DAO searching in vain for any evidence to suggest or prove Pedro had the ability to travel undetected between the U.S. and D.R. and that he frequently did so. The DAO can search all it wants – but it won't find the evidence it's seeking because Pedro's credible alibi evidence overwhelmingly proves that, once he landed in Santo Domingo, D.R. on July 13, 1991, he didn't leave the D.R. until March 24, 1994.

### E. The absence of eyewitnesses placing Pedro in the Darrien Street neighborhood corroborates Pedro's alibi evidence

For nearly thirty years the DAO has hung its hat on Sarah Robinson's pre-trial statements and trial testimony. Doing so, however, is a double-edged sword because, according to Robinson, she saw Pedro in the Darrien Street neighborhood on July 23, 1991 and everyday thereafter – even on July 26, 1991. Robinson said she saw Pedro every day because Pedro and the other Dominicans who worked at the Darrien Street drug house had a set schedule. During her July 26, 1991 statement to Detective Bentham, Robinson claimed she saw Pedro at the Darrien Street drug house that morning at 9:15 a.m. Robinson, more importantly, said Pedro and the other Dominicans were at the drug house every day from 9:00 a.m. until 9:30 p.m. – except on Sundays when they only worked until 5:00 p.m.

```
Q  Have you seen Them ?

A  yes.

Q  when ?

A  Today, AT 3042 N Darien ST ThaT There
   Drug House, where They Serve The People AT
   IT WAS ABouT 9:00 AM PoPidiTo CAme FiRsT, Then
   ABouT 9:15 MARCiANo Came. They Come EveryDay
   AT ABouT 9AM & STAy Till 9:30 PM ExcepT FoR
   SunDay's They Close 5 PM.                      116
```

Here's the fundamental problem with Robinson's statement, however: If Pedro

had such a predictable or set schedule – where he worked at the Darrien Street drug

house every day from 9:00 a.m. until 9:30 p.m. – and Robinson supposedly saw him at

the drug house the morning of July 26, 1991, it's quite telling the PPD and DAO never

found other witnesses, outside Sam Wilkerson, who placed Pedro in the drug house or

the Darrien Street neighborhood in the weeks and days leading up to July 23, 1991 or

on July 23, 1991.[117]

---

[116] E.C.F. #71-1, p. 58. In her first statement, keep in mind, Robinson supposedly mixed-up Popodito and Marciano's names.  Thus, in this statement, Pedro is Marciano because Marciano was the driver/gunman in this statement.

[117] Wilkerson, keep in mind, never identified Pedro Reynoso as Popodito before trial.  In his July 31, 1991 statement, Wilkerson simply claimed a man named Popodito was the driver/gunman.  Thus, technically speaking, the only witness who placed Pedro in the neighborhood – before trial – was Robinson.

For instance, the PPD raided the Darrien Street drug house on July 27, 1991 –

and arrested: (1) Felo Garcia; (2) Miguel Reynoso (no relation to Pedro); (3) Carlos

Manuel Sanchez; and (4) Emilio Concepcion Martinez.[118] The PPD and DAO could've

easily asked all four whether they'd seen Pedro in the neighborhood on July 23, 1991 –

or even the day before – July 26, 1991. The PPD, however, never asked any of these

people, including Felo Garcia, whether Pedro was in the neighborhood on July 23, 1991

and thereafter.[119]

More importantly, the PPD took Robinson's July 26, 1991 statement to heart

because it raided the Darrien Street drug house the following morning on July 27, 1991.

According to Officer Carrasquillo's post-arrest interview, he and other officers and

detectives raided the drug house between 8:30 and 9:00 a.m.[120] Pedro, though, was

nowhere to be found, which isn't surprising because he was in the D.R. attending his

son's baptism.

Also, it's not as if Pedro presented a last-minute, surprise alibi defense. When

the INS detained Pedro on March 23, 1994, Pedro said he was in the D.R. on July 23,

1991. Likewise, on July 17, 1994, Father de la Cruz wrote a letter to the PPD explaining

how Pedro couldn't be the driver/gunman because Pedro was in the D.R. on the day

---

[118] E.C.F. #71-1, pp. 110-112.
[119] Counsel should qualify this statement based on the significant *Brady* violations already present in this case. For all we know, the PPD could've asked these witnesses about Pedro's whereabouts, and they could've said they didn't see him in the days or week leading up to the double-murder, but because this exculpatory information substantially weakened the PPD's case against Pedro, the PPD suppressed this information.
[120] E.C.F. #71-1, p. 110.

of the double-murder.[121]  Lastly, trial counsel filed Pedro's *Notice of Alibi Defense* in November 1995, which listed four alibi witnesses.[122]

In short, the PPD and DAO had more than enough time to find additional witnesses placing Pedro in the Darrien Street neighborhood between July 13, 1991 and July 23, 1991.  It didn't.  The DAO simply presented Sarah Robinson and Sam Wilkerson.  The absence of additional witnesses speaks volumes because it corroborates Pedro's alibi evidence.

**F.    The DAO's emphasis on Dr. Rosario's August 2020 statement is misplaced because Dr. Rosario's statement is consistent with Pedro's narrative and Dr. Rosario only saw Pedro a few times – each of which occurred after the July 13, 1991 to July 27, 1991 time period**

The DAO misconstrued Dr. Rosario's August 2020 statement to absurdly claim Pedro frequently traveled between the U.S. and D.R. undetected.[123]

*First*, Dr. Rosario's statement is consistent with Pedro's narrative.  Before returning to the D.R. on July 13, 1991, Pedro lived in the U.S. – meaning when Dr. Rosario met him during Catalina's pre-natal visits he was, in fact, visiting the D.R.

*Second*, based on Nalley's birthdate – April 22, 1992 – Catalina became pregnant with Nalley shortly after Pedro entered the D.R. on July 13, 1991.  Thus, because Pedro was visiting the D.R. when he impregnated Catalina, he accompanied Catalina to her pre-natal visits with Dr. Rosario.

---

[121] NT, Trial, 6/28/1996, pp. 65-68.
[122] E.C.F. #71-1, pp. 121-124.
[123] E.C.F. #77, p. 22.

*Third*, Dr. Rosario's relationship with Pedro was quite limited because she only saw him during Catalina's pre-natal visits, and these visits occurred well after the July 13, 1991 to July 27, 1991 time period.

*Fourth*, none of Pedro's dozen-plus alibi witnesses said he left the D.R. once he landed on July 13, 1991 – and these people knew Pedro far better than Dr. Rosario because they saw and interacted with him daily once he landed in the D.R. on July 13, 1991.

## *SCHLUP* ANALYSIS

The DAO's *Schlup* analysis represented nothing more than a credibility analysis, *i.e.*, because it believed the Chuito and alibi evidence wasn't credible, it argued Pedro couldn't satisfy *Schlup*. The DAO's credibility analysis, however, was quite flawed as evidenced by the above arguments.

In his *Supplemental Amended 2254 Petition*, Pedro comprehensively explained why and how the credible Chuito and alibi evidence satisfied *Schlup*.[124] Pedro stands by these arguments because the DAO's flawed credibility analysis doesn't undermine them or prove them meritless. Put differently, "it is more likely than not that no reasonable juror would have convicted him in the light of [his] new evidence." *Schlup v. Delo*, 513 U.S. at 327.

---

[124] E.C.F. #71, pp. 93-137.

## FEDERAL CLAIMS

That the DAO didn't address Pedro's federal claims is quite frustrating because, if the Court grants *Schlup* relief and takes jurisdiction of Pedro's 2254 petition, the DAO will – undoubtedly – ask for additional time to address Pedro's federal claims. This additional time will only prolong the already very protracted District Court proceedings because Pedro filed his 2254 petition nearly seven years ago in April 2016.

Consequently, because the DAO didn't address Pedro's federal claims, Pedro stands by the merits of his federal claims. If the Court grants *Schlup* relief, the Court should grant Pedro a new trial based on his *Brady* claims, his *Strickland* claim, or both.

## RIGHT TO AN EVIDENTIARY HEARING

Because the *Schlup* issue turns on questions of credibility, as evidenced by *Schlup's* emphasis on new credible evidence and the parties' respective credibility arguments, the Court can hold an evidentiary hearing to develop additional facts regarding the credibility question.

The decision to hold an evidentiary hearing is within the Court's discretion. *Goldblum v. Klem*, 510 F.3d 204, 220 (3d Cir. 2007) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). In "deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. at 474. Here, if Pedro's new evidence satisfies *Schlup*, he'll – presumably – be entitled to AEDPA relief because, if he satisfies *Schlup*, he's proved

it's more likely than not that no reasonable factfinder would've found him guilty beyond a reasonable doubt in light of his new evidence. *Schlup v. Delo*, 513 U.S. at 327.

The Court, moreover, isn't bound by 28 U.S.C. § 2254(d)'s deferential and "substantially higher threshold," *id.* at 473, because the *Schlup* issue is a purely federal procedural issue the state courts didn't – and wouldn't have – considered and adjudicated. In other words, an evidentiary hearing would develop facts not for a federal claim presented to and adjudicated by the state courts, but for a federal procedural issue the state courts didn't – and couldn't – consider and adjudicate.

The purely federal and procedural nature of the *Schlup* question, moreover, makes *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022) irrelevant. *Shinn* is limited to 28 U.S.C. § 2254(e)(2) – but this section isn't applicable.

Section 2254(e)(2) provides that, if a prisoner "has failed to develop the factual basis of a [federal] claim in State court proceedings," a federal court may hold "an evidentiary hearing on the [federal] claim" in only two limited scenarios. Either the federal claim must rely on (1) a "new" and "previously unavailable… rule of constitutional law" made retroactively applicable by the Supreme Court, or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." §§2254(e)(2)(A)(i), (ii). *Shinn v. Ramirez*, 142 S. Ct. at 1734.

The *Schlup* question isn't about whether Pedro "failed to develop the factual basis" of his federal claims in the state courts. It's about whether the Court can take jurisdiction of his untimely 2254 petition and adjudicate his federal claims. Consequently, because there's no "fault analysis" – § 2254(e)(2) is inapplicable. Indeed, *Shinn* focused entirely on whether PCRA counsel's ineffectiveness for failing to raise – and thus factually develop – a meritorious federal claim in the state courts could be attributable to the defendant, making the defendant "at fault" for failing to develop the factual basis of said federal claim. *Shinn* held that, even when the holding of *Martinez v. Ryan*, 566 U.S. 1 (2012) is considered, if a defendant's PCRA attorney failed to raise – and therefore failed to develop the factual basis of – a federal claim in the state courts, the defendant is still "at fault" for his PCRA attorney's failures and therefore can't receive an evidentiary hearing in federal court under § 2254(e)(2). Again, these facts aren't applicable here.

## CONCLUSION

WHEREFORE, based on the foregoing facts, arguments, and authorities, Pedro Reynoso respectfully requests the following relief:

1. An Order finding his new evidence credible/reliable under *Schlup/McQuiggins*.

2. An Order concluding his new credible evidence satisfies the *Schlup/McQuiggins* actual innocence standard, which allows the Court to adjudicate his *Strickland* and *Brady* claims.

3. An Order granting him a new trial based on his *Strickland* claim.

4. An Order granting him a new trial based on his *Brady* claim.

5. If the Court believes additional fact-finding is necessary regarding the federal question under *Schlup/McQuiggin*, an Order granting an evidentiary hearing under Rule 8 of the *Rules Governing Section 2254 Cases*.

6. Any other relief the Court deems necessary to protect his federal constitutional right to fundamentally fair habeas corpus proceedings.

Respectfully submitted this the 5th day of January, 2023.

*/s/Craig M. Cooley*
**COOLEY LAW OFFICE**
1308 Plumdale Court
Pittsburgh, PA 15239
412-607-9346 (cell)
craig.m.cooley@gmail.com
www.pa-criminal-appeals.com